John T. PHILLIPS, Jr., Plaintiff,

v.

CROWN CENTRAL PETROLEUM CORPORATION, Defendant.

Corrado Frank TUMMINELLO, Plaintiff,

v.

CROWN CENTRAL PETROLEUM CORPORATION, Defendant.

Charles Phillip FREITAG, Plaintiff,

v.

CROWN CENTRAL PETROLEUM CORPORATION, Defendant.

Carroll Charles MYERS, Plaintiff,

v.

CROWN CENTRAL PETROLEUM CORPORATION, Defendant.

Civ. Nos. 73–303–H, 73–304–H, 73–504–H and 73–506–H.

United States District Court, D. Maryland.

Feb. 17, 1977.

**1158**

Robert G. Levy, Peter H. Gunst, Allan P. Hillman and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiffs.

James H. Kelley, Arthur Wineburg and Bergson, Borkland, Margolis & Adler, Washington, D.C., Morton A. Sacks and Cable, McDaniel, Bowie & Bond, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge:

Four independent gasoline service station dealers have brought these consolidated cases against their supplier-landlord, Crown Central Petroleum Corporation, seeking treble damages, attorneys' fees, injunctive relief and costs under the antitrust laws. Following a four-week non-jury trial, this Court filed a written Opinion, *Phillips v. Crown Central Petroleum Corp.,* 395 F.Supp. 735 (D.Md.1975) (*Phillips II*),[1] finding in favor of the plaintiffs as to most of the liability issues presented. In accordance with the findings and conclusions set forth in that Opinion, an Order was entered on July 1, 1975, providing that Crown has violated Section 1 of the Sherman Act, 15 U.S.C. § 1, in the following respects:

"1. Defendant Crown Central Petroleum Corporation has violated Section 1 of the Sherman Act by combining with competitors horizontally in the fixing of the retail prices of gasoline in the Baltimore metropolitan area.

"2. Defendant Crown Central Petroleum Corporation has violated Section 1 of the Sherman Act by entering into illegal vertical agreements with plaintiffs fixing the retail prices of gasoline in the Baltimore metropolitan area.

"3. Defendant Crown Central Petroleum Corporation has violated Section 1 of the Sherman Act by entering into illegal vertical agreements with plaintiffs fixing the retail prices of motor oil in the Baltimore metropolitan area.

"4. Defendant Crown Central Petroleum Corporation has violated Section 1 of the Sherman Act by entering into illegal tying agreements with plaintiffs relating to the sale of Crown motor oils in the Baltimore metropolitan area."

The Order further provided that each plaintiff was entitled to treble damages, attorneys' fees and costs, all to be determined after further proceedings. With the agreement of the parties, the Court had ordered a bifurcated trial, with all issues of liability being tried first and all issues of remedy reserved for later proceedings.

Following further proceedings in October 1975, this Court made certain rulings as to the scope of the permanent injunction to be entered, and an Order giving effect to such rulings was entered on December 15, 1975.[2] Thus, the questions which remain to be decided relate to the amount of damages, attorneys' fees and costs to which the successful plaintiffs are entitled.

Following further discovery by the parties, the issue of damages recoverable under Section 4 of the Clayton Act, 15 U.S.C. § 15,

---

1. In an earlier Opinion, *Phillips v. Crown Central Petroleum Corp.,* 376 F.Supp. 1250 (D.Md. 1973) (*Phillips I*),this Court granted plaintiffs' motion for a preliminary injunction. As a result of the preliminary injunction entered at that time and the permanent injunction entered later, the plaintiffs have remained as Crown service station operators, except for plaintiff Tumminello who vacated his station shortly after this Court ruled on February 17, 1976 that

the injunction would not be continued as to him.

2. For reasons not relevant here, the Court subsequently modified that Order as to plaintiff Tumminello. Defendant has, since the liability trial, filed numerous post-trial motions seeking relief in various forms, the most recent of which has been denied in a Memorandum and Order filed this same date.

came on for trial before this Court on June 21, 1976. Thereafter, plaintiffs filed an application for the allowance of attorneys' fees and a proposed bill of costs. Following the evidentiary hearing on damages, the parties filed exhaustive post-trial briefs on all questions presently before the Court, and final argument was heard in open court on October 19, 1976.

## I

### Damages

In *Phillips II, supra,* this Court found that Crown has violated Section 1 of the Sherman Act (1) by combining with competitors horizontally in the fixing of the retail prices of gasoline in the Baltimore metropolitan area; (2) by entering into vertical agreements fixing the retail prices of gasoline in the same market area; and (3) by entering into vertical and tying agreements relating to the sale of Crown motor oils in the same market area. 395 F.Supp. at 757–59, 760–64, 764–66.[3] The Court further determined that these illegal marketing practices caused injury to each plaintiff's "business or property" within the meaning of Section 4 of the Clayton Act. On the basis of the evidence produced, the Court concluded that "plaintiffs have met their burden of establishing a direct causal connection between [Crown's] antitrust violations . . . and injuries suffered by them." *Id.* at 768 (footnote omitted).

The parties have stipulated to the amount of damages which this Court should award each plaintiff because of illegal restraints relating to the sale of Crown motor oils.[4] However, the parties vigorously dispute both the existence of and the amount of any damages recoverable by plaintiffs as a result of both the horizontal and the verti-

cal violations pertaining to the sale of gasoline. Plaintiffs claim that they are entitled to single damages in the amounts of $38,579 for Phillips, $49,156 for Tumminello, $30,335 for Freitag and $54,561 for Myers. Plaintiffs further ask that these amounts be trebled under Section 4 of the Clayton Act. Crown objects to awards in these amounts, contending that they are no more than speculative estimates which are without foundation on the record here. In addition, Crown asserts that under the so-called "pass-on" defense, the plaintiffs actually suffered no injury and are therefore not entitled to any award at all.

Plaintiffs' claims for damages rest essentially upon the expert testimony of Dr. Carl F. Christ, a Professor of Economics at the Johns Hopkins University. Using the price and gallonage statistics provided by Crown,[5] Dr. Christ has calculated separately the horizontal and vertical damages of each plaintiff. These damages have been measured from the time the particular plaintiff became a Crown dealer until April 3, 1973, when the first complaint in these consolidated cases was filed in this Court. Dr. Christ made no adjustment in the period for those plaintiffs who filed suit after April 3, 1973, but simply assumed that Crown then relinquished its control over retail gasoline prices. Crown has not questioned the correctness of the period used by Dr. Christ in his calculations, and the Court will accept this period for the purpose of determining the amount to be awarded to each plaintiff both as vertical and as horizontal damages.

### (a) The Vertical Damages Claimed

As this Court found in *Phillips II, supra* at 768, plaintiffs "suffered injury when they were prohibited from raising their retail prices by Crown's illegal vertical agree-

---

**3.** The Court also found that Crown had unlawfully refused to renew the service station lease of each plaintiff because of his opposition to the above illegal practices. 395 F.Supp. at 768–69. The equitable relief awarded each plaintiff has remedied this particular wrong.

**4.** The amount stipulated is $250 for each plaintiff as single damages. This stipulation has

been made "without prejudice to Crown's right to contest the Court's finding of liability on these issues, and without defendant admitting that any monetary damage was incurred by plaintiff."

**5.** The parties have stipulated to the correctness of these figures.

ments." Dr. Christ affixes a monetary value to this injury through a comparison of the actual gross margin, that is the retail price less the wholesale price,[6] for each plaintiff after these suits were filed and the theoretical gross margin for each plaintiff had Crown continued to maintain its vertical restraints on the retail price of gasoline for the period in question. The actual gross margin has been determined from the known wholesale prices paid by and the retail prices charged by plaintiffs for regular and premium gasoline during the six-month period from April 3 to September 30, 1973, inclusive. The evidence shows that each plaintiff's gross margin increased markedly and abruptly in April of 1973 after Crown permitted the plaintiffs to set their own retail prices. For the same six-month period, Dr. Christ then computes the daily theoretical gross margin for each plaintiff, based on Crown's own formula for setting retail prices.[7] By subtracting the theoretical from the actual gross margin for each day, Dr. Christ obtains the increase in gross margin attributable to the cessation of Crown's vertical price-fixing. Every increase is then weighted by the number of days it existed and averaged over the entire six-month period. In this manner, Dr. Christ arrives at an average gross margin increase for each plaintiff from April through September of 1973.[8] Since plaintiffs set their own retail gasoline prices during that period, Dr. Christ concludes that this average increase is an approximate measure of the amount by which margins prior to April 3, 1973 were held down through vertical price-fixing by Crown.

Using this average gross margin increase, Dr. Christ then calculates the total monetary damages sustained by each plaintiff as a result of Crown's illegal vertical agreements. This is done by multiplying each plaintiff's own increase by the amount of gasoline he would have purchased and sold in the absence of price-fixing. This latter figure is determined from the number of gallons purchased by that plaintiff since becoming a Crown dealer but before April 3, 1973. Because Crown's retail price-fixing efforts undoubtedly impeded plaintiffs' actual sales in this period.[9] Dr. Christ indicates that these gallonage figures are probably lower than what plaintiffs would otherwise have sold in a free market. He therefore asserts that, if anything, he has understated the amounts in concluding that the plaintiffs have suffered damages for vertical price-fixing as follows: Phillips, $8,050; Tumminello, $15,274; Freitag, $8,132; and Myers, $9,650.

6. In this Opinion, the Court will adopt Dr. Christ's definition of "gross margin" as meaning retail price less wholesale price.

7. In *Phillips II, supra* at 746–47, this Court found that it was Crown's practice to allow its dealers a 1/4 cent increase in gross margin for each 3/4 cent increase in the wholesale price of gasoline. Thus, a 3/4 cent increase by Crown in the wholesale price would produce a 1 cent increase in the retail or pump price.

8. This approach produced a much higher average gross margin increase for Myers and a much lower one for Phillips than for the other two plaintiffs. Attributing these results to certain unique market conditions, Dr. Christ did not use the Myers and Phillips figures but rather employed the average of the increases experienced by Tumminello and Freitag as a measure for Myers and Phillips as well. Crown has not, and cannot, complained of this approach, for its net effect is to reduce the total amount of damages sought by plaintiffs. Had Dr. Christ used in his computations the actual average gross margin increases for Myers and

Phillips, the combined damages for these two plaintiffs would have been much higher.

9. Dr. Christ convincingly shows that, freed from Crown's illegal restraints, the retail prices of gasoline would have been lower, thereby prompting greater sales. Dr. Christ reaches this conclusion by comparing the average gross margin increases after April 3, 1973 with the average differentials between the retail prices required by Crown to be charged by plaintiffs and what he has identified as the competitive retail price level. Since the average increases are less than these differentials, Dr. Christ concludes that plaintiffs, on their own, would have posted lower retail prices during the damage period. He further explains that this would have been possible because the wholesale prices charged by Crown would have been considerably lower with the absence of the horizontal conspiracy.

**(b)** *The Horizontal Damages Claimed*

██ Although this Court has concluded that Crown conspired with its competitors horizontally to fix the *retail* prices of gasoline, the resulting injury to the plaintiffs arises because of the *wholesale* prices charged by Crown. Such is the necessary result of Crown's method of pricing its gasoline. Because Crown first decided on the appropriate retail price to be charged for its gasoline by the dealers and then worked back to the wholesale price to be charged the dealer, *Phillips II, supra* at 758, any artificially high *retail* price necessarily increased the *wholesale* price above the competitive level. *Id.* at 768. Thus, in *Phillips II, supra* at 768, this Court concluded that "[a]s buyers, the plaintiffs are entitled to damages if [Crown] as the seller charged them an illegal price" in furtherance of the horizontal conspiracy to fix the retail price of gasoline.

Dr. Christ computes the horizontal damages suffered by the plaintiffs as the difference between the wholesale price Crown charged each plaintiff and the competitive wholesale price it charged other dealers in the Baltimore area. He measures this overcharge by means of an average wholesale price differential for the period from November 24, 1970 through April 3, 1973, when this litigation began.[10] As computed by Dr. Christ, this average differential shows how much each plaintiff paid per gallon for gasoline above what the wholesale price would have been without the horizontal conspiracy. To determine the average wholesale price differential, Dr. Christ again relies upon the fixed relationship between Crown's wholesale and retail prices. For the above-mentioned period, he first ascertains each plaintiff's weighted average retail price differential by comparing plaintiffs' actual retail prices with what he believes to have been the competitive ones.[11] Using a factor of 3/4 to account for Crown's pricing formula, Dr. Christ then converts this retail price differential into the average wholesale price differential for each plaintiff. By next multiplying this latter figure by the number of gallons of gasoline purchased by the particular plaintiff during the damage period, Dr. Christ calculates damages for horizontal price-fixing to be as follows: Phillips, $30,529; Tumminello, $33,882; Freitag, $22,203; and Myers, $44,911.

Central to Dr. Christ's appraisal of plaintiffs' horizontal damages is his determination of competitive retail prices in the Baltimore market area. To make such a determination, Dr. Christ has relied upon the findings made by this Court in *Phillips II,* and in particular on Findings of Fact Nos. 14, 18, 29, 32 and 39. In essence, this Court therein found that the purpose of the horizontal conspiracy was to eliminate retail price disturbances among independent dealers in the Baltimore metropolitan area, thus artificially raising the price of gasoline charged and avoiding any retaliatory pricing by the major oil companies. 395 F.Supp. at 742–43, 745–46, 747. In view of these findings, Dr. Christ concludes that the lowest retail price in the Baltimore area for Crown gasoline would represent a reasonable estimate of what the competitive retail price would have been in the absence of the horizontal conspiracy.

Support for this conclusion is derived from Finding of Fact No. 19, in which this Court found that in 1971 Crown was not able to stabilize the retail price in the area around York and Padonia Roads in Timonium, Maryland, where its service station P–57 is located. 395 F.Supp. at 743. If the

---

**10.** Although two plaintiffs became Crown dealers before November 24, 1970, Dr. Christ testified that he computed the average wholesale price differentials from that time because Crown's statistical data began with that date. Crown has not objected to this starting point. However, Phillips did not become an independent Crown dealer until January 25, 1971. In making his damage calculations, Dr. Christ has appropriately adjusted the damage period for this plaintiff.

**11.** Like the average gross margin increase used in computing vertical damages, the average retail price differential has been weighted by the number of days for each particular amount that plaintiffs' prices exceeded the competitive level.

lowest retail price charged by a Crown dealer is accepted as the competitive retail price absent a horizontal conspiracy, Dr. Christ concludes that the retail prices charged at station P–57, where the horizontal conspiracy failed, would be the lowest, or among the lowest, of all of Crown's Baltimore dealers. Indeed, Crown's own records of the retail prices charged by its dealers throughout the Baltimore area from November 24, 1970 to April 3, 1973 further support this conclusion. These records show that, for some twelve months of this period, station P–57 posted the lowest retail prices in the entire area.[12] Crown's records further indicate that, although not always the only service station posting the lowest retail prices, station P–57 most consistently charged the lowest price. While acknowledging that peculiar market conditions might in part have influenced the pricing at station P–57, Dr. Christ convincingly asserts that the better explanation for such consistently low prices would be the nonexistence of an effective horizontal price-fixing agreement for this area. Based on these facts as to station P–57, Dr. Christ concludes that the lowest retail price of Crown gasoline in the Baltimore area would be the competitive retail price which would have prevailed in such area had there been no horizontal conspiracy.

Furthermore, Dr. Christ asserts that, if anything, his determination of horizontal damages, like that of vertical damages, understates plaintiffs' actual injury. By using the lowest retail price of Crown gasoline as the starting point for computing plaintiffs' horizontal damages, Dr. Christ has assessed no damages during those periods when Crown was completely successful in stabilizing retail prices throughout the Baltimore area. Under such circumstances and during those times, plaintiffs' retail, and thus wholesale, prices were the same as those of the lowest priced Crown dealer. Thus, even though plaintiffs were then charged an illegal wholesale price, Dr. Christ's calculations do not include any increment for the injury suffered during that period. Dr. Christ thereby concludes that his approach is a conservative one which gives Crown the benefit of any doubt.

### (c) Defendant's Contentions

Asserting that the plaintiffs are entitled to no damages at all on the record here, Crown attacks these calculations of horizontal and vertical damages for each plaintiff in several different ways. First, Crown offers alternative, competitive explanations for the pricing phenomena which underly Dr. Christ's calculations and contends that the damages suggested by Dr. Christ lack any satisfactory degree of accuracy. In particular, Crown complains that Dr. Christ has failed to account for numerous changes and aberrations in the conditions of the market area. Secondly, Crown points out that this Court found only unlawful price-fixing of retail prices of gasoline, see Phillips II, supra at 757 n. 7, and Crown argues that, by separately claiming both horizontal and vertical damages, plaintiffs seek a double recovery. Crown concedes that the two theories utilized by Dr. Christ (the "before and after" theory for vertical damages and the "yardstick" theory for horizontal damages) are acceptable means of measuring antitrust damages, but argues that, in combination, these theories compensate the plaintiffs twice for the same injury. Finally, with regard to plaintiffs' claim for horizontal damages, Crown relies upon the so-called "pass-on" defense and submits that plaintiffs in fact suffered no injury at all because they passed on any unlawful overcharge to their customers.

In challenging the accuracy of plaintiffs' damage calculations, Crown points to the possible market conditions existing over the comparative control periods used by Dr. Christ. Insofar as the calculation of vertical damages is concerned, Crown focuses its attack upon the significance and amount of any gains in gross margin. Rather than attribute each plaintiff's increase in gross margin to the removal of vertical pricing

---

**12.** It is significant that this station's prices dropped in August of 1971, after Crown's unsuccessful attempt that year to fix retail prices in the York and Padonia Roads area.

restraints as Dr. Christ does, Crown explains these increases as the product of a gasoline shortage from April through September of 1973. This shortage, Crown contends, distorts plaintiffs' gross margins, thereby making that period an inappropriate one for comparison.

As an alternative argument, Crown contends that even if this Court accepts the period after the complaint was filed as a proper basis for computing plaintiffs' vertical damages, the control period should extend only until August 24, 1973 when certain Federal Energy Administration price regulations became effective.[13] Under these regulations, Crown was required to reduce its wholesale prices while plaintiffs remained free to set their own retail prices. Although retail prices subsequently came under federal regulation on September 8, 1973 only plaintiff Myers was then posting above the allowed retail level and was thus required to reduce his prices. In light of this disparate effect of federal price controls upon gasoline refiners and dealers, Crown contends that plaintiffs maintained abnormally high gross margins between August 24 and September 30, 1973 and that therefore these margins should not be considered in computing the damages resulting from vertical price-fixing.

Dr. Christ's method for measuring plaintiffs' horizontal damages is likewise attacked by Crown. Specifically, Crown objects to his defining the competitive retail price level for the damage period in terms of the lowest price among all its Baltimore dealers. Low prices, Crown argues, are caused by numerous factors other than competition. As an example, Crown points to a combination of new entrants into the competitive picture and intermittent price wars in the York and Padonia Roads area as in fact causing the low prices at station P–57. Since Dr. Christ made no adjustments for factors such as these, Crown contends that he has not correctly identified the competitive retail price level by simply taking the lowest price prevailing among all Crown dealers.

### (d) *The Law as Applicable to the Claims and Defenses*

While Crown's contentions are pertinent to the exactness and precision of Dr. Christ's analysis, they do not require this Court to reject his calculations of plaintiffs' damages. In asserting its objections to Dr. Christ's approach, Crown seeks to impose upon plaintiffs the burden of proving damages to a higher degree of certainty than is required for such proof in antitrust litigation. Recognizing that damage issues in such cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts," the Supreme Court has cautioned "[t]rial and appellate courts alike . . . [to] observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff . . ." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). These practical limitations have produced

> a clear distinction between the measure of proof necessary to establish the fact that [plaintiff] had sustained some damage, and the measure of proof necessary to enable the [finder of fact] to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, *not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.* (Emphasis added)

*Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *accord, Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265–66, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Dantzler v. Dictograph Products, Inc.,* 309 F.2d 326, 330 (4th Cir. 1962); *Greene v. General Foods Corp.,* 517 F.2d 635, 660 (5th Cir. 1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).

Once, as here, the causal connection between the defendant's proven violation of

---

**13.** These regulations are found in 6 C.F.R. § 150.351 et seq. (1974).

the antitrust laws and a plaintiff's injury has been established, "the plaintiff may enter the more uncertain realm of evaluating the portion of the injury that may be attributed to the defendant's wrongful conduct." *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). Indeed, in *Terrell,* the Fifth Circuit emphasized that plaintiff's "expert on damages need not be armed on the right hand with a slide rule, on the left hand with a computer. He is allowed some economic imagination so long as it does not become fantasy." *Id.* at 25; *accord, Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 671 (5th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975).

Thus, while damages in an antitrust case "may not be determined by mere speculation or guess," the Supreme Court has repeatedly found that "it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result may be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co., supra,* 282 U.S. at 563, 51 S.Ct. at 250; *accord, Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 123–24, 89 S.Ct. 1562; *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 264–66, 66 S.Ct. 574. One Court has gone so far as to indicate that this standard even allows for "proof of losses which border on the speculative" where necessary "in order to implement the policy of the antitrust laws." *Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 887 (1st Cir. 1966).[14] An approach to the determination of measure of damages like that of *Zenith Radio Corp.* is particularly appropriate in a case such as this one where the defendant's own disregard for the antitrust laws has "obscured conditions that would have prevailed in a free marketplace and made impossible precise calculation of damages." *Greene v. General Foods Corp., supra* at 663. As the Supreme Court commented many years ago in *Eastman Kodak Co. v.*

*Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927): "[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."

 When examined in the light of these legal standards, Dr. Christ's analysis, with the one exception noted hereinafter, represents a more than adequate assessment of the damages sustained by each plaintiff as a result of Crown's antitrust violations. After consideration of all of Crown's arguments and the record here, this Court concludes that the assumptions made by Dr. Christ are generally sound enough to support "a just and reasonable estimate of the damage based on relevant data". *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 264, 66 S.Ct. at 580; *see Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1206–07 (9th Cir. 1975), *cert. denied* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Herman Schwabe, Inc. v. United States Shoe Machinery Corp.,* 297 F.2d 906, 911 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

With reference to the vertical damages calculated, the evidence here does not show, as contended by Crown, that plaintiff in the April to September 1973 period knowingly acted in such a way as to influence the amount of damages they would recover. At that time, plaintiffs had not as yet been successful in the liability stage of this case, and they were conducting their regular business operations subject to normal competitive considerations. Nor does it appear (except as noted below) that other factors made this period an improper one for use by Dr. Christ in computing vertical damages. Plaintiffs were during this period setting their own retail prices, and their pricing decisions at this time were not affected by Crown's price-fixing activities.

**14.** In view of the evidence produced in this case, it is not necessary to apply such a standard here. Proof of damages furnished by the plaintiffs in this case is not speculative or conjectural.

In support of its position, Crown called as an expert witness Dr. Charles L. Trozzo, an officer of Richard J. Barber Associates, Inc.[15] Although objecting to Dr. Christ's approach in calculating damages, Dr. Trozzo conceded in his testimony that his objections had no basis in fact but were simply "thoughts off the top of [my] head, nothing [I] really thought about." Rather than undertaking to support the professed inaccuracy of Dr. Christ's approach by referring to proven facts, Dr. Trozzo has done no more than identify hypothetical competitive factors not considered by his counterpart. For example, Dr. Trozzo made no study of market conditions in order to substantiate his claim that prices at station P–57, used by Dr. Christ in computing horizontal damages, were actually caused by new entrants into the competitive picture and by price wars. Indeed, in his testimony, Dr. Trozzo admitted the uncertainty of his own explanation for the consistently low prices posted at Crown service station number P–57. A conjectural attack of this sort does not, as Crown argues, undermine the reasonableness of Dr. Christ's damage figures. An expert relied upon by a plaintiff in an antitrust case need not exhaust the realm of possibilities for computing damages, "particularly where [the defendant] offers no clearly superior set of assumptions that could have been applied to the available data with more accurate results." *Greene v. General Foods Corp., supra* at 662.

One of Crown's principal attacks on Dr. Christ's analysis is based on the contention that an award of both horizontal and vertical damages would give the plaintiffs a double recovery for the same injury. This Court would disagree. Crown's horizontal and vertical violations of the antitrust laws resulted in separate and distinct injuries suffered by the plaintiffs. Although the retail price of gasoline was the target of both illegal agreements, each violation affected that price in a different manner.

The vertical violations directly controlled retail prices while the horizontal conspiracy strengthened that control by means of inflated wholesale prices. As this Court observed in *Phillips II, supra* at 761, the "findings in this case of an illegal horizontal combination between Crown and certain competitors directly complement and support the findings of illegal vertical agreements with dealers."

Thus, plaintiffs as dealers were injured on both the wholesale and retail levels in marketing Crown gasoline. Regardless of the wholesale price charged, Crown illegally interfered with plaintiffs' gross margins by restricting the retail price of gasoline. This injury may be attributed solely to the illegal vertical agreements. Even if there had been no vertical violations and plaintiffs had been able to fix their own retail prices, plaintiffs would still have suffered injury because of the horizontal conspiracy which enabled Crown to charge artificially high wholesale prices. Conversely, absent a horizontal conspiracy, the plaintiffs would still have suffered loss because of the fixing by Crown of their retail prices. Thus, the horizontal and vertical violations resulted in different injuries to plaintiffs' businesses: the former produced an overcharge in wholesale prices while the latter prevented any increase in gross margin at the retail level. As long as the measured increase in gross margin attributable to the removal of vertical pricing restraints does not reflect any wholesale price decrease resulting from the cessation of the horizontal conspiracy (and the evidence here indicates that it does not), there is no double recovery. Accordingly, separate damage assessments for the horizontal and vertical violations are proper.

Nor is there any overlap or double counting which results from the methods employed by plaintiffs' expert in computing damages in this case. From Dr. Christ's testimony and the other evidence here, this Court finds that his horizontal and vertical

---

15. That firm does consulting work in connection with corporate mergers and public utility rate-making investigations.

damage calculations, as modified herein, properly reflect each plaintiff's total monetary loss caused by Crown's gasoline price-fixing activities. By employing both the "before and after" and the "yardstick" methods for computing damages, Dr. Christ has not, as Crown argues, compensated plaintiffs twice for the same injury. Not only may these two methods be used in conjunction, *e.g., Bigelow v. RKO Radio Pictures, Inc., supra,* but they may also be "specially tailored to fit" any peculiar circumstances, *Lehrman v. Gulf Oil Corp., supra* at 668. Thus, although the proof offered by plaintiffs in support of their damage claims encompasses elements of both methods but is not a classic example of either one, the use of both methods does not indicate any double counting.

More importantly, in this particular case, Dr. Christ has avoided any overlap by separately computing plaintiffs' horizontal and vertical damages. Since Crown's wholesale prices did not drop after these suits were filed, the average gross margin increases used by Dr. Christ in assessing vertical damages do not embrace any part of the overcharge which forms the basis for the horizontal damages suffered by plaintiffs. The average gross margin increases show only the extent that each plaintiff was able to raise his gross margin by fixing his own retail prices. The amount of any overcharge by Crown in its wholesale prices is then separately accounted for by the horizontal damage figures. In short, the Court finds no double counting in Dr. Christ's computation of plaintiffs' total damages.

■ Finally, Crown contends that the so-called "pass-on" defense would defeat any recovery by the plaintiffs in this case. A similar argument advanced at the liability stage of these proceedings was rejected by this Court. In *Phillips II,* this Court said the following (395 F.Supp. 768):

> As buyers, the plaintiffs are entitled to damages if defendant as the seller charged them an illegal price, even though they may have passed on the overcharge to their customers. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 483–494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

In challenging this Court's reliance on *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), Crown argues, *inter alia,* that the Supreme Court in that case was addressing the "pass-on" defense in terms of causation of injury and was not there concerned with the amount of damages. The authorities relied upon by Crown do not support such a contention.

Since *Chattanooga Foundry & Pipe Works v. Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906), likewise a treble-damage antitrust case, the Supreme Court has recognized that "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *See Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 262–63 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). In another early case, *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918), Mr. Justice Holmes recognized that the "general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss * * *."

In the *Hanover Shoe* case, the Supreme Court narrowly circumscribed the availability of the "pass-on" defense in antitrust litigation. Although acknowledging "that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where * * * the passing-on defense" would be appropriate, 392 U.S. at 494, 88 S.Ct. at 2232, the Court broadly held as follows:

> We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury *and*

*damage* within the meaning of § 4 [of the Clayton Act.].

If in the face of the overcharge the buyer does nothing and absorbs the loss, he is entitled to treble damages. This much seems conceded. The reason is that he has paid more than he should and his property has been illegally diminished, for had the price paid been lower his profits would have been higher . . . We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower. (Emphasis added)

Id. at 489, 88 S.Ct. at 2229.

In the opinion, Mr. Justice White was quite clearly discussing both the fact of the injury and the amount of damages sustained when he observed that proof of the amount of the overcharge made out a *prima facie* case. In concluding his discussion of the subject, he said the following, at page 494, 88 S.Ct. at page 2232:

Our conclusion is that Hanover proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that United had overcharged it during the damage period and showed the amount of the overcharge; United was not entitled to assert a passing-on defense.

Decisions of the lower federal courts since *Hanover Shoe* recognize that the Supreme Court in that case, although it did not abolish the "pass-on" defense, did strictly limit its applicability to those few situations where plaintiff's lack of injury is readily provable. *Standard Industries, Inc. v. Mobil Oil Corp.,* 475 F.2d 220, 224 (10th Cir. 1973); *Obron v. Union Camp Corp.,* 477 F.2d 542, 543 (6th Cir. 1973); *see West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1088 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 323 F.Supp. 381, 385–87 (E.D.Pa.1970). This strict limitation of the "pass-on" defense in antitrust litigation comports with the general rule in regard to damages not go to beyond the first step. *See Southern Pacific Co. v. Darnell-Taezner Lumber Co., supra; accord, In re Western Liquid Asphalt Cases,* 487 F.2d 191, 197 (9th Cir. 1973), *cert. denied,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974).

The facts here quite clearly do not fall within the narrow circumstances mentioned in *Hanover Shoe* when the "pass-on defense" might be applicable. The relationship between Crown's wholesale prices and plaintiffs' retail prices does not readily lend itself to proof that plaintiffs avoided injury by passing any overcharge on to their customers. When plaintiffs reacted to Crown's increases in wholesale prices by raising their retail prices, they were doing no more than insuring that their margin of profit did not decline. To establish the "pass-on" defense, however, there still "remain[s] the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable." *Hanover Shoe, Inc. v. United Shoe Machinery Corp., supra,* 392 U.S. at 493, 88 S.Ct. at 2231. Footnote 9 at page 493, 88 S.Ct. at page 2231 goes on to say:

The mere fact that a price rise followed an unlawful cost increase does not show that the sufferer of the cost increase was undamaged. His customers may have been ripe for his price rise earlier; if a cost rise is merely the occasion for a price increase a businessman could have imposed absent the rise in his costs, the fact that he was earlier not enjoying the benefits of the higher price should not permit the supplier who charges an unlawful price to take those benefits from him without being liable for damages. This

statement merely recognizes the usual principle that the possessor of a right can recover for its unlawful deprivation whether or not he was previously exercising it.

In this case, the defendant has not made the necessary showing and therefore cannot rely on the "pass-on" defense. Quite clearly there was no pre-existing cost-plus contract or other arrangement between the parties which would readily show that the plaintiffs sustained no damage at all as a result of the overcharges.

Crown's reliance on *In Re Western Liquid Asphalt, supra,* and *Obron v. Union Camp Corp., supra,* is misplaced. Those cases involved factual circumstances very much different from the facts here present. In *Western Liquid Asphalt,* the Court was concerned with "pass-on" not as a defense but as a theory of recovery relied upon by plaintiffs at different levels of a chain of distribution. Other cases which have considered this quite different problem have recognized that antitrust claimants who are too remote in the chain of distribution cannot recover from a price-fixing manufacturer. *Mangano v. American Radiator & Standard Sanitary Corporation,* 50 F.R.D. 13 (E.D.Pa. 1970), *aff'd,* 438 F.2d 1187 (3d Cir. 1971); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp., supra.*[16] In the *Mangano* case, Judge Lord concluded (and the Third Circuit affirmed his decision) that the *Hanover Shoe* rationale applies not only when a manufacturer defendant asserts a pass-on defense to the claim of an initial purchaser but also to a claimant at the end of a chain of distribution who is faced with precisely the same problems of proof not by way of defense but as a part of its affirmative claim.

*Obron v. Union Camp Corp., supra,* is inapposite here because it involved an arrangement which more closely approached a sales commission rather than a buyer-seller relationship. And in *Umphres v. Shell Oil Co.,* 1973–2 Trade Cas. ¶ 74,709 (S.D.Tex. 1973), *aff'd* 512 F.2d 420 (5th Cir.), *cert. denied,* 423 U.S. 929, 96 S.Ct. 278, 46 L.Ed.2d 257 (1975), the trial court did no more than speculate that the defendant under certain circumstances might be entitled at the trial to assert a pass-on defense.

*Hanover Shoe* is clearly controlling here. In this case, the plaintiffs were direct purchasers from the price-fixing defendant and are entitled to recover damages measured by the amount of the overcharge, whether or not the possibility may have existed that they may have passed on the overcharge to their customers. *Hanover Shoe, supra,* 392 U.S. at 483–94, 88 S.Ct. 2224.

Although this Court has rejected Crown's arguments seeking to defeat the recovery of vertical or horizontal damages in any amount, Crown has made one valid criticism of Dr. Christ's analysis with respect to vertical damages. The "before and after" method used to measure this aspect of plaintiffs' monetary losses is appropriate "only where there has been some showing that the market conditions in the two periods [the damage and the control periods] were similar but for the impact of the violation." *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc., supra* at 1207; *accord, Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1352–53 (3d Cir. 1975).

Here, the control period adopted by Dr. Christ, namely April 3 through September 30, 1973, is not in its entirety fairly

---

**16.** Crown has also suggested that it may be subjected to multiple recoveries because there are presently pending various actions filed by consumers in which Crown has been named as a defendant. But *Mangano* and similar cases indicate that remote purchasers are not always entitled to recover from a price-fixing manufacturer. In any event, *Hanover Shoe* recognizes the right of an immediate purchaser from the defendant, like each plaintiff here, to recover no matter what the result may be as to more remote claimants.

representative of the experience of each plaintiff as a Crown dealer during the damage period. Dr. Christ testified that this control period was extended through September 30, 1973, because he wanted a period which was sufficiently long but which would not include the dislocation caused by the oil embargo of the fall of 1973. But, as Crown correctly points out, by including the period after August 24, 1973, Dr. Christ has included the equally disruptive effects of Federal Energy Administration price controls.[17] Although acknowledging that these regulations artificially increased plaintiffs' gross margins, Dr. Christ did not compensate for this favorable treatment because he felt that other market conditions, also not accounted for, must have likewise benefited Crown during the control period. However, Dr. Christ was unable to identify any such conditions, and this Court concludes that there is accordingly no factual support for his use of the longer period. Thus, while Dr. Christ's basic approach for measuring plaintiffs' vertical damages is sound, the Court will not accept the gross margins obtained under the federal price controls as representative of plaintiffs' experiences in the absence of Crown's antitrust violations. The control period for computing vertical damages should therefore extend from April 3 only through August 24, 1973. Even though the period is thus reduced from approximately six months to slightly less than five months, this Court is satisfied on the record here that the period is sufficiently long to serve as a proper yardstick. Using this period, plaintiffs incurred the following losses as a result of Crown's vertical restraints on the retail prices of gasoline: Phillips, $2,298; Tumminello, $6,017; Freitag, $1,188; and Myers, $2,742.

### (e) *The Amounts Awarded as Damages*

Subject to the one modification noted, this Court will accept for the purpose of awarding damages the analysis of Dr. Christ and the calculations based thereon. Concededly "an eminent economist", Dr. Christ was fully qualified on the basis of education and prior experience to testify as an expert on damages in a case of this sort. Except as noted, his conclusions are fully supported by the evidence in this case.[18]

Accordingly, this Court holds that plaintiffs have suffered damages in the following amounts as a result of Crown's illegal price-fixing activities:

| | Horizontal Damages | Vertical Damages | Motor Oil Damages | Total Damages |
|---|---|---|---|---|
| Phillips | $30,529 | $2,298 | $250 | $ 33,077 |
| Tumminello | $33,882 | $6,017 | $250 | 40,149 |
| Freitag | $22,203 | $1,188 | $250 | 23,641 |
| Myers | $44,911 | $2,742 | $250 | 47,903 |
| | | Total single damages | | $144,770 |

17. The extent of this disruption is evidenced by the diminution in plaintiffs' vertical damages if the interval from August 24 through September 30, 1973 is eliminated from the control period.

18. One of the exhibits in evidence is Dr. Christ's "Final Report on the Monetary Damage Suffered by Plaintiffs * * *." Attached to this Report are various tables which show in detail how the various calculations were made.

These amounts will be trebled pursuant to Section 4 of the Clayton Act, and the separate awards are therefore as follows:

Treble Damages

| | |
|---|---|
| Phillips | $ 99,231 |
| Tumminello | 120,447 |
| Freitag | 70,923 |
| Myers | 143,709 |
| Total treble damages | $434,310 |

## II

### Attorneys' Fees

A successful litigant in an antitrust case brought under Section 4 of the Clayton Act is entitled not only to treble damages but also to "the cost of suit, including a reasonable attorney's fee." Plaintiffs have accordingly filed in this case a petition seeking the award of an attorney's fee.

The decision of the Third Circuit in *Lindy Bros., Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973) (*Lindy I*) adopted new standards for the award of attorneys' fees following the settlement of a national class action in a multidistrict antitrust litigation. Subsequently, in *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (1976) (*Lindy II*), the Third Circuit, in an *en banc* decision, discussed and explained its previous Opinion and ruled on certain other questions presented in that appeal.[19] Other federal courts have applied the *Lindy Bros.* standards in cases involving class action settlements. *See City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 470–473 (2d Cir. 1974); *Brandenburger v. Thompson,* 494 F.2d 885, 890 (9th Cir. 1974); *Grunin v. International House of Pancakes,* 513 F.2d 114, 127 (8th Cir. 1975); *Arenson v. Board of Trade,* 372 F.Supp. 1349, 1355 (N.D.Ill.

1974); *Liebman v. J. W. Petersen Coal & Oil Company,* 63 F.R.D. 684, 690–91, 701 (N.D.Ill.1974); *In re Gypsum Cases,* 386 F.Supp. 959, 962 (N.D.Cal.1974).

In discussing the proper standards which would govern the award of fees to be paid from a settlement fund, the Third Circuit in *Lindy I* said that the first inquiry of the Court should be into the hours spent by the attorneys, including how many hours were spent in what manner by which attorneys. After determining the time spent, the District Court should then undertake to fix an hourly rate of compensation to be applied to the hours worked. While the amount thus found to constitute reasonable compensation should be the "lodestar" of the Court's fee determination, at least two other factors should be taken into account in computing the value of attorneys' services, namely the contingent nature of success and the extent, if any, to which the quality of an attorney's work mandates either increasing or decreasing the amount to which the Court has found the attorney reasonably entitled. 487 F.2d at 168.

*Lindy I* and *Lindy II* involved questions pertaining to the award of attorneys' fees from a settlement fund in a multidistrict class action. These consolidated cases, involving antitrust claims asserted by four dealers individually, have resulted in actual trials, one concerning the issue of liability and a second concerning the issue of damages. As plaintiffs prevailed at these trials, the award of attorneys' fees is expressly mandated by Section 4 of the Clayton Act.

Although the principles of the *Lindy* cases would appear to be generally applicable here, the Fourth Circuit has not required the trial court in a Section 4 case to undertake the detailed inquiry mandated by the Third Circuit for the fixing of fees to be paid from a settlement fund in multidistrict litigation. In the latter instance, the fees paid to the attorneys reduce the amounts paid the claimants. Here, the plaintiffs' damage awards will not be diminished by the amount of the fees fixed by the Court,

19. Both *Lindy I* and *Lindy II* were appeals from decisions of the undersigned Judge, sitting in the Eastern District of Pennsylvania. The lower court Opinions, which discussed many other fee questions besides those considered in the appeals, are reported at 341 F.Supp. 1077 (E.D. Pa.1972) and 382 F.Supp. 999 (E.D.Pa.1974).

and the abuses which the *Lindy* decisions sought to correct are not present in this case. *See Pitchford v. Pepi, Inc.,* 531 F.2d 92 (3d Cir. 1976). In *Advance Business Systems & Supply Co. v. SDM Corporation,* 415 F.2d 55, 70 (4th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970), the Court approved an award of attorneys' fees made by Judge Thomsen of this Court in a Section 4 case. The Fourth Circuit approved Judge Thomsen's consideration of the following factors: "The magnitude and complexity of the litigation, the time and labor spent, the standing of counsel at the bar, and other relevant considerations set out in [his] supplementary opinion." 415 F.2d at 70. In the earlier case of *Osborn v. Sinclair Refining Co.,* 207 F.Supp. 856, 864 (D.Md.1962), Judge Thomsen had referred to and relied upon the factors set out in the Canon 12 of the Canons of Professional Ethics of the American Bar Association.[20] Again, on appeal, the Fourth Circuit did not disturb the award. *Osborn v. Sinclair Refining Co.,* 324 F.2d 566 (4 Cir. 1963).

In this case, the parties agree that the starting point for the award should be the hours spent by the various attorneys and the billing rate applicable to those hours. Plaintiffs have furnished detailed schedules, indicating that the total value of the time spent by the plaintiffs' attorneys amounts to $213,913.50. However, plaintiffs concede that some of this time is not recoverable in this case. These actions were brought under both Section 4 and Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. A plaintiff who is granted injunctive relief under Section 16 is not entitled to recover attorney's fees. *Alphin v. Henson,* 538 F.2d 85 (4th Cir. 1976); *Byram Concretanks, Inc. v. Warren Concrete Prod. Co. of N.J.,* 374 F.2d 649, 651 (3d Cir. 1967).

On the basis of time alone, plaintiffs assert that the value of the services for which they should be compensated here is $155,632.50, and they further assert that this figure should be increased because of the contingency and quality factors. A breakdown of the time figures is as follows:

| Plaintiffs' Attorney | Time- Hours | Average Rate During Billing Period | Value |
|---|---|---|---|
| Robert G. Levy | 381.7 | $80 | $ 30,536.00 |
| Berryl A. Speert | 3.1 | 70 | 217.00 |
| Peter H. Gunst | 296.6 | 50 | 14,830.00 |
| George W. Maugans | 1,673.7 | 40 | 66,948.00 |
| Allan P. Hillman | 1,041.4 | 40 | 41,656.00 |
| Michael P. Waxman | 41.3 | 35 | 1,445.50 |
| Totals | 3,437.8 | | $155,632.50 |

Time relating to other matters in this litigation for which plaintiffs are not seeking compensation is as follows:

| Preliminary Injunction | Time-Hours | Value |
|---|---|---|
| Robert G. Levy | 50.0 | $ 4,000.00 |
| Peter H. Gunst | 12.0 | 600.00 |
| George W. Maugans | 352.7 | 14,108.00 |
| Allan P. Hillman | 225.0 | 9,000.00 |
| Totals | 639.7 | $27,708.00 |

**20.** See A.B.A. Code of Professional Responsibility, DR 2–106(B).

| Permanent Injunction and Motions to Dissolve | Time-Hours | Value |
|---|---|---|
| Robert G. Levy | 20.0 | $ 1,600.00 |
| Allan P. Hillman | 228.7 | 9,148.00 |
| Totals | 248.7 | $10,748.00 |

| Post-Trial Motions re C. Frank Tumminello | Time-Hours | Value |
|---|---|---|
| Robert C. Levy | 30.0 | $ 2,400.00 |
| Peter H. Gunst | 116.9 | 5,845.00 |
| George W. Maugans | 78.8 | 3,152.00 |
| Allan P. Hillman | 210.7 | 8,428.00 |
| Totals | 436.4 | $19,825.00 |

| Totals relating to other matters | 1,324.8 | $58,281.00 |
|---|---|---|

In *Phillips II,* this Court found that Crown had not violated Section 1 of the Sherman Act by restricting plaintiffs in the sale of antifreeze and in the sale of cigarettes, candy and soda through vending machines. Recognizing that they are not entitled to attorneys' fees for time spent in connection with that part of the case, plaintiffs have not included in the above figures any of the time spent in connection with that issue.

In opposing plaintiffs' petition for the award of attorneys' fees, Crown does not claim that the time listed was not actually expended and does not claim that the hourly rates listed are unreasonable rates. However, Crown does contend that plaintiffs' petition does not make a proper deduction for time spent on portions of these proceedings for which no fee may be awarded. In particular, Crown complains that there was insufficient subtraction for the Section 16 aspect of the case and that there was insufficient subtraction for the time spent on claims for which the plaintiffs failed to recover or which were *de minimis.* Crown claims that the time figure should therefore be reduced to $56,938.62, and that no increase at all should be made in this case because of contingency or quality factors. Finally, Crown argues that the attorneys' fee to be awarded in this case should not exceed a reasonable percentage of the single damages awarded.

Various decisions of the Fourth Circuit and of other Courts have recognized that attorneys' fees awarded a successful litigant in a Section 4 case may exceed the amount of single damages. In *Advance Business Systems, supra,* the single damages amounted to approximately $17,000, and the attorneys' fee awarded was some $35,900. In *Osborn, supra,* the original single damage award was $325, and Judge Thomsen allowed an attorney's fee of $14,000.[21] *See also Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders,* 393 F.2d 75 (9th Cir. 1968); *Volasco Products v. Fry Roofing Co.,* 346 F.2d 661 (6th Cir. 1965).

█ Crown argues that only in "small damage" cases may attorneys' fees exceed single damages. However, in *Volasco Prod-*

---

21. Although on appeal the amount of single damages was raised to $12,000, the fee still exceeded that award.

*ucts, supra,* the damages were $25,000 and the fee awarded was double that amount or $50,000. Here, there are four separate damage awards, ranging from $23,641 to $47,903. This Court concludes that in this case the amount of the attorneys' fee awarded should not be limited by the amount of the single damages, provided that the attorneys' fees claimed are otherwise reasonable under all the circumstances.

In claiming that the time figures submitted by plaintiffs' attorneys should be reduced, Crown contends that 50% of the time spent on liability issues should be allocated to Section 16 proceedings. It is further argued that 17% of the Section 4 time should be allocated to antifreeze and vending machine issues, and that 11½ of the Section 4 time should be allocated to motor oil issues. Accordingly, Crown contends that attorneys' fees in this case should be fixed at no more than $56,938.62.

There is no support in this record for the arbitrary deductions suggested by Crown, which are based on conjecture and estimates. On the other hand, plaintiffs' figures are amply supported by the record here. Plaintiffs' attorneys have maintained detailed time records and have made their allocations of time based on these records.[22] In support of their petition, plaintiffs' attorneys have furnished tables showing a precise breakdown of the time spent by each individual attorney in undertaking various kinds of compensable activities.[23] When these tables are reviewed in the light of the records and files of the undersigned Judge and in the light of this Judge's familiarity with all aspects of the case, this Court concludes that plaintiffs' attorneys have properly subtracted from their final figures all time spent on Section 16 aspects of this

case and have properly excluded from the final figures submitted all time spent in connection with the antifreeze and vending issues. Total time spent on the issues as to which relief has been granted amounts to 4,762.6 hours. From this total time have been deducted 1,324.8 hours which were spent in connection with Section 16 aspects of this case and in connection with post-trial motions relating to plaintiff Tumminello's claims. Thus, 72% of the total time has been assigned to the issues as to which damages have been awarded. On the record here, this Court concludes that such an allocation of time is a reasonable one.[24] Having been "on the firing line" exposed to the litigants, their strategies, positions and proofs, *Ace Heating & Plumbing Co., Inc. v. Crane Company,* 453 F.2d 30, 34 (3d Cir. 1971), the undersigned Judge has thereby had "close and intimate knowledge of the efforts expended and the value of the services rendered." *See Lea v. Cone Mills Corporation,* 467 F.2d 277, 279 (4th Cir. 1972). Based on time alone then, plaintiffs are entitled to recover attorneys' fees in the amount of $155,632.50.

The final question before the Court is whether or not the fees determined on the basis of time alone should be increased because of contingency and quality factors. In *McKittrick v. Gardner,* 378 F.2d 872 (4th Cir. 1967), a case dealing with the allowance of attorneys' fees to lawyers representing claimants to social security benefits, Judge Haynsworth observed in his Opinion that the contingency of compensation should be considered in awarding fees. In his Opinion, he said the following (at 875):

> The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases

---

**22.** Crown has not requested an evidentiary hearing for the purpose of challenging these time records, nor has Crown submitted any records of its own to show the time spent by plaintiffs' attorneys on various parts of this case.

**23.** The categories listed include: pleadings, discovery, court appearances, fee application, briefs and research, general matters, trial and trial preparation and damages.

**24.** Crown's argument as to the motor oils issue is particularly specious. It was agreed by the parties to fix the single damages for that issue at $250 for each plaintiff, or a total of $1,000. Such a resolution of this question, *inter alia,* saved Crown the expense of paying additional attorneys' fees to plaintiffs which would have been incurred in proving these damages.

in which his client prevails must take account of the lawyer's risk of receiving nothing for his services. Charges on the basis of a minimal hourly rate are surely inappropriate for a lawyer who has performed creditably when payment of any fee is so uncertain.

In *McKittrick,* the Fourth Circuit also approved consideration of the quality factor in awarding attorneys' fees. At page 874–75, Judge Haynsworth said:

The district judge will know what assistance he received from the claimant's attorney. If, with little or no assistance, he is required to read the entire * * * record, discover the issues and do the basic research in his library before he approaches performance of his ultimate decision-making role, he will know it. He will know it if, in our adversary system, the lawyers have performed superbly or adequately, their function of eliminating irrelevancies, pointing up the issues to be decided and supplying the court with the legislative and judicial materials which he must have at hand when he reaches his ultimate conclusion. He will know, too, the worth of their analysis of the relevant materials, for he will have appraised them in depth in coming to his own decision. If the lawyer's performance has been somewhere in between the excellent and the wholly unacceptable, the judge will know it in all of its gradients. The judge who has decided a case, need hold no evidentiary hearing to determine the extent and quality of the assistance he received from the lawyers in reaching his conclusion and in preparing an opinion. The judge may be assisted by a statement of the time spent by the lawyer, though such statements must be subordinate to the judge's evaluations of the lawyer's contribution to the decision. The evidence of a lawyer's fidelity and commitment to his client's cause, which is reflected in his performance in court, may be colored by reports or evidence of extra-legal financial and consultative services rendered by the lawyer to a claimant experiencing difficult, even insolvable, problems while awaiting receipt of the benefits he seeks. In short, the judge may receive supplemental reports and statements from the lawyer in aid of his fee claim * * * but the controlling criterion will remain the quantity and quality of the lawyer's services as observed by the judge in the judicial proceedings.

█ Both the contingency and quality factors are relevant here. Plaintiffs' attorneys accepted employment on a contingent fee basis. They were opposed by highly skilled defense counsel who tenaciously defended the case at both the liability and the damage phases of the litigation. Plaintiffs' attorneys were faced at the outset with the risk that despite vigorous and competent efforts on their part, success was not guaranteed, and they might receive no compensation at all for the services performed. *See City of Detroit v. Grinnell Corporation, supra* at 471. In antitrust cases in which counsel are employed on a contingent fee basis, the prospect of compensation beyond standard hourly rates should be held out as an inducement to encourage competent counsel to act as a private attorney general and bring civil actions for the enforcement of the antitrust laws. *Advance Business Systems & Supply Co. v. SCM Corporation,* 287 F.Supp. 143, 161 (D.Md.1968); *Brandenburger v. Thompson, supra* at 888–89; *Dolgow v. Anderson,* 43 F.R.D. 472, 494 (E.D.N.Y.1968); *Hornstein, Legal Therapeutics: The Salvage Factor in Counsel Fee Awards,* 69 Harv.L.Rev. 658, 662–663 (1956).

Of even more significance here is the fact that there had been no criminal prosecution preceding the filing of these civil actions. Rather, it was this private litigation which apparently led to an investigation by the federal government of price-fixing activities on the part of Crown and others, with the result that Crown, various other oil companies, an industry organization and certain individuals have now been charged in this Court with criminal anti-trust violations. *United States v. Society of Independent Gasoline Marketers of America,* Criminal No. B–76–0314, filed June 1, 1976. Whatever the outcome of that criminal

case, the probability of success in this civil case could not at the outset be judged in terms of a previous successful criminal prosecution. *See Lindy I, supra* at 471. Plaintiffs and their attorneys were therefore compelled to investigate and develop the necessary facts on their own, without the assistance of an earlier criminal case in which public resources had been used to establish *prima facie* violations of the law.

Insofar as the quality factor is concerned, Mr. Robert G. Levy, the senior attorney representing the plaintiffs in this case, is an experienced antitrust practitioner whose standing at the bar is very high. *See Advance Business Systems & Supply Co. v. SCM Corporation,* 287 F.Supp. 143, 161 (D.Md.1968). It should be noted, however, that his associates in this case are younger members of the bar and have not had his experience in antitrust matters. From a review of the pleadings, briefs and other written materials and from personal observation, this Court finds that plaintiffs' attorneys have been skillful and imaginative in their conduct of this litigation.

Relying on decisions awarding fees in different multidistrict litigations, plaintiffs suggest that the amount determined to be due their attorneys on the basis of a reasonable hourly rate should be doubled or trebled because of contingency and quality factors. In the *Lindy Bros.* litigation, the undersigned Judge applied these factors and doubled certain of the amounts found to be due based on an hourly rate, while not increasing certain other amounts. 382 F.Supp. at 1023–24. In *Lindy II,* the Third Circuit, in a divided *en banc* decision, approved the doubling as being properly within the trial judge's discretion but eliminated certain of the categories. 540 F.2d at 109–116.[25]

But the *Lindy* and other similar opinions in multidistrict cases involved circumstances not present here. The plumbing fixture antitrust litigation, in which various national class actions had been asserted, was no "run-of-the-mill" suit. 382 F.Supp. at 1019. Over 10,000 claims had been filed in the builder-owner settlement alone, and 374 different cases were included in the one massive litigation. This was the largest number of cases of any matter that has ever come before the Judicial Panel on Multidistrict Litigation. The settlement fund amounted to $29,300,000. Complex and novel questions arose because of the large numbers of plaintiffs and classes of plaintiffs competing with each other to establish standing. Because of these and other circumstances there present, figures in *Lindy* based on time alone were doubled.

The present case is not comparable to *Lindy* as to either size or complexity. Nevertheless, this Court is satisfied that because of the contingency and quality factors discussed herein, the amount determined to be due based on time alone should be increased. Applying these factors in the light of the amounts recovered by plaintiffs, this Court concludes that a reasonable attorney's fee in these consolidated cases would be $200,000.[26] Plaintiffs are also entitled to recover costs.

### III

#### Conclusion

An appropriate Order entering the various judgments will be signed by the Court. Whether or not so characterized, Findings of Fact and Conclusions of Law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in this Opinion and in the earlier Opinion reported at 395 F.Supp. 735, except where Findings in the earlier Opinion have expressly been modified.

---

25. The two dissenting Judges disapproved of the doubling.

26. The fees in each case would therefore be $50,000. The amount for all four cases would represent an increase of slightly less than 30% of the value of the total services performed based on considerations of time alone.