John T. PHILLIPS, Jr., Corrado Frank Tumminello, Charles Phillip Freitag, and Carroll Charles Myers, Plaintiffs-Appellees,

v.

CROWN CENTRAL PETROLEUM COR-PORATION, Defendant-Appellant.

Nos. 77–1780, 78–1078.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1978.

Decided July 2, 1979.

James H. Kelley, Robert A. Burka, Arthur Wineburg, Washington, D. C. (Bergson, Borkland, Margolis & Adler, Washington, D. C., on brief); Morton A. Sacks, Baltimore, Md. (Cable, McDaniel, Bowie & Bond, Baltimore, Md., on brief), for appellants.

Robert G. Levy, Peter H. Gunst, Allan P. Hillman, Baltimore, Md. (Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for appellees Phillips, Freitag & Myers.

J. Hardin Marion, William C. Sammons, Baltimore, Md. (Tydings & Rosenberg, Baltimore, Md., on brief), for appellee Tumminello.

Before HAYNSWORTH, Chief Judge, COWEN,* Senior Judge, and WIDENER, Circuit Judge.

COWEN, Senior Judge:

Defendant Crown Central Petroleum Corporation (Crown), is an independent wholesaler of gasoline and other oil products in the Maryland marketing area. Plaintiffs are four of Crown's independent dealers. The plaintiffs brought private antitrust actions against Crown, charging violations of 15 U.S.C. §§ 1, 15, and 26 (§ 1 of the Sherman Act, and §§ 4 and 16 of the Clayton Act). The complaints alleged that Crown entered into a horizontal conspiracy with its competitors to stabilize the retail price of gasoline in Maryland; that Crown forced its independent dealers into a vertical price-fixing agreement to control the retail price of gasoline; that Crown entered into tying agreements with its dealers which required that only Crown brands of motor oil could be sold, and that these conspiracies and agreements supported and reinforced each other to create an elaborate and pervasively illegal system of reducing competition and restraining trade in the Maryland gasoline market. After a trial, the district court found Crown liable on most of these charges and issued an injunction which required the defendant to enter into new 3-year leases with each of the plaintiffs and forbade Crown from cancelling the leases (or refusing to renew them) for any retaliatory or illegal reason. The determination of money damages was reserved for a separate trial.

Three days after the permanent injunction issued, the attorney for the plaintiffs notified the court that one plaintiff, Corrado Frank Tumminello, had committed perjury, both in pretrial proceedings and during the course of the trial. Tumminello had also fabricated business records to support his perjured testimony. Crown moved for various forms of relief based on the discovery of perjury; but the district court, after considering the motions and the evidence, reaffirmed all of its previous actions except the permanent injunction (which was vacated with respect to Tumminello to protect "the integrity of the court" and otherwise continued) and one finding of

* Wilson Cowen, Senior Judge of the Court of Claims, sitting by designation.

fact (which was stricken). Crown appealed to this court all of the district court's rulings in favor of the plaintiffs.

While this appeal was pending, the district court held a separate trial to determine the quantum of money damages. On February 17, 1977, the court awarded plaintiffs total treble damages of $434,310 and attorneys' fees of $200,000. *Phillips v. Crown Central Petroleum Corp.*, 426 F.Supp. 1156 (D.Md.1977). An appeal from the damage award followed.

In *Phillips v. Crown Central Petroleum Corp.*, 556 F.2d 702 (4th Cir. 1977), we vacated the permanent injunction without prejudice and remanded the case to the district court with instructions to hold a hearing regarding the extent of Tumminello's perjury. Consideration of all the other issues on appeal was stayed pending the outcome of this hearing, which was held on July 22, 1977. After the hearing the district court struck some of its findings of fact, but reaffirmed its previous decision in all important respects. Crown now appeals again to this court, challenging the manner in which the remand hearing was conducted and renewing its appeals on all the previous rulings of the district court.

### I. The Remand Hearing

We turn first to the objections raised by the defendant to the proceedings on remand from the original appeal. To understand the posture of this aspect of the case, some factual background is necessary.

Plaintiff Tumminello testified at trial and in pretrial proceedings to several events which tended to prove the existence of a horizontal conspiracy among Crown and its competitors to fix prices. According to his testimony, he had on at least four occasions refused to raise his retail gasoline price when instructed to do so by Crown representatives. Those representatives told him at those times that he had to raise his price because his delay was "screwing up the arrangement" with the other oil companies. This testimony formed the basis for several of the district court's findings of fact.

After the first permanent injunction issued, an accountant examining Tumminel-

lo's business records was unable to square the written account books with Tumminello's story of one of the episodes described above (the one alleged to have taken place on April 24, 1971). Tumminello finally admitted to his counsel that he had lied about the incident; destroyed the genuine business records for that day, and fabricated new records that would support his false story. He continued to stand by his other testimony.

The defendant filed motions pursuant to Rules 52(b), 59(a), and 60(b) of the Federal Rules of Civil Procedure, asking the court to dismiss all of the claims of every plaintiff, or to grant a new trial or other extensive discretionary relief. The district court simply struck the finding of fact which dealt with the spurious incident and reaffirmed its judgment in all other respects. On appeal from this decision, we stayed consideration of the merits of the case until the district court could conduct a "plenary hearing," "re-appraise the case," and then determine the appropriate findings and conclusions. *Phillps v. Crown Central Petroleum Corp., supra*, 556 F.2d at 705. By so doing we intimated no view on the soundness of the conclusion reached by the district court (a finding that the perjury was limited and did not infect large areas of the case); we simply instructed the court to hear Tumminello *ore tenus* and receive such order evidence as might be required to assess the full impact of the perjury on the case as it stood.

The remand hearing took place July 22, 1977. Prior thereto Crown took a 2-day deposition of Tumminello and this was offered in evidence. However, Crown had previously indicated that it did not intend to call Tumminello to testify but would rely instead on his deposition. In view of the explicit directions from this court, the district court directed plaintiff to call Tumminello, who testified and was cross-examined extensively in open court by Crown. Crown also called as a witness, Mr. Barry Owens, an employee of Crown's counsel, who had performed the analysis of Tumminello's records. Crown introduced exhibits and a dep-

osition in testimony. The trial court denied the requests of both parties to call a large number of witnesses on the issue of horizontal price fixing on the ground that such action would transform the remand hearing into a new trial. The trial judge also denied Crown's request to recall to the stand several of Crown's witnesses who had testified in the 1974 trial, plus another witness, James C. Blackman, who had testified previously only by deposition. The court concluded that the hearing of such testimony was not required by our order. In an opinion filed August 19, 1977, the district court denied all of Crown's post-trial motions and reaffirmed the court's former findings and conclusions, except for two findings of fact which were stricken in view of the testimony given at the remand hearing.

The defendant raises several objections to the conduct of the remand proceedings. Most of them can be traced to a disagreement over the precise nature of the hearing contemplated by this court when we issued the remand order. The district court enunciated in this way the question to be answered at the hearing:

> The question ultimately presented at the remand hearing was essentially a narrow one, namely, whether Tumminello is now telling the truth or whether he is now lying in confirming on the stand under oath substantially all his prior testimony. * * *

The defendant argues that this approach is somehow inconsistent with our instruction to "reappraise the case and * * * determine the appropriate findings and conclusions" in light of the evidence adduced at the hearing. We do not agree. The difficulty we found with the case on the first appeal was that the trial judge had not heard testimony from Tumminello since the disclosure of his perjury and it was uncertain how pervasive his perjury may have been. Therefore, we were reluctant to affirm findings of fact based, in part at least, on the testimony of an admitted perjurer until Tumminello was examined *ore tenus* and the district court had an opportunity to reassess his testimony.

On review, we find that the purpose of the remand order was fulfilled to the extent that no reversal is required on account of the conduct of the remand hearing. The trial court's refusal to again hear four Crown witnesses who were implicated in varying degrees by Tumminello's testimony was not error, since the district court had previously found their testimony uncorroborated, and since only one of them, John W. Conway, was involved in the particular incident which Tumminello admitted he had fabricated. To put it in another way, the district court would have been required to hear these witnesses again only if Tumminello's perjury extended into areas other than those covered by his frank admission. Since the trial judge decided that the remainder of Tumminello's testimony was credible, he had no need to rehear the testimony of these witnesses.[1]

---

1. Crown argues strenuously that the district court erred in refusing to hear in open court the testimony of James C. Blackman, one of the witnesses Crown wished to call at the remand hearing to refute Tumminello's testimony. Blackman testified at the trial only by deposition, and the trial judge never had an opportunity to observe his demeanor on the stand. But the conflict between Tumminello and Blackman was very limited, and may have been non-existent. Tumminello testified that on some occasions Blackman told him that pricing arrangements had been made with the other independent oil companies. Blackman denied making those statements. The only evidence of the statements other than Tumminello's direct testimony was a notation made by him after a telephone call with Blackman, which recorded that Blackman had told him that "everybody is going up." Tumminello later admitted that he would interpret such a statement to mean that there was a pricing agreement with competitors, so both witnesses may have been telling the truth. Furthermore, Blackman's supposed conflict with Tumminello closely resembled the conflicts between Tumminello and several other Crown witnesses who gave live testimony; the trial judge gave no credence to the testimony of any of those witnesses, and there is no reason to believe that one more witness repeating the same tale would have any further effect on the judge's determination of credibility. Finally, Crown could have presented Blackman in person at the first trial as a witness if his testimony on this point had been as important as Crown now claims it was. For all these

Taking a slightly different tack, Crown argues that on remand the district court should have applied the maxim *falsus in uno, falsus in omnibus*, reinforced by the judicially enunciated observation that "intentional falsification of material records presumptively destroys the weight of the offender's evidence as to the entire case." *Gratsos v. Moisie Bay*, 287 F.2d 706, 707 (4th Cir. 1961). Crown argues that the testimony which Tumminello admitted was false differed in no material respect from much of his other testimony, and that therefore all of that other testimony should be regarded as suspect until corroborated. Even if we were inclined to utilize the maxim cited above, which this court has at various times labeled "worthless," [*Virginia Ry. Co. v. Armentrout*, 166 F.2d 400, 406 (4th Cir. 1948)], "inappropriate," [*United States v. Harris*, 346 F.2d 182, 185 (4th Cir. 1965)], and "always treacherous," [*Phillips v. Crown Central Petroleum Corp., supra*, 556 F.2d at 705], we would not adopt the defendant's reasoning, since the maxim has always been purely informatory, never mandatory. *Norfolk and Western Ry. Co. v. McKenzie*, 116 F.2d 632, 635 (6th Cir. 1941). The district court *could have* decided, on the basis of Tumminello's perjury, that he was unworthy of belief on other points as well. The court did not choose to do so, and we cannot say on the record before us that the refusal was error. The court found the rest of Tumminello's testimony to be substantiated and corroborated by other evidence of record, and we conclude that Crown has failed to show that the district court's findings on these issues are clearly erroneous.

Crown's other objections to the conduct of the remand hearing—that it was scheduled at a time inconvenient to Crown's counsel, that prehearing discovery was not as extensive as it might have been, and that the videotape of Tumminello's remand deposition should have been received in evidence—all pertain to matters traditionally left to the trial judge's informed discretion, and we decline to disturb such rulings ab-

sent a showing of abuse. That showing was not made here.

## II. The Horizontal Price-fixing Findings

Since we find that no reversible error was committed in the conduct of the remand hearing, the remaining issues must be decided on the record as finally reaffirmed by the trial judge after that proceeding. We have reviewed that ample record, assisted by able briefs from counsel for both sides, and we find therein sufficient evidence to support the trial judge's findings that a horizontal conspiracy to fix prices existed and that Crown participated in that conspiracy.

Several employees and officers of Crown testified to telephone calls between Crown and its competitors; the subject of those calls was retail pricing. Wilbur Pressler, Crown's Manager of Administration (Marketing), testified that he called Ashland Oil and Refining Company and Meadville Oil Company about the retail prices being charged by some of those companies' gas stations, because those stations "were engaged in price competition that could seriously affect sales of the Crown station" near them. Pressler came close to admitting that his motive for making those calls was to stop the price competition among the retail gas stations concerned. Pressler also testified that he received phone calls from the Society of Independent Gasoline Marketers of America (SIGMA) concerning future retail price moves in the Maryland gasoline market. Pressler believed these calls to be "improper," and testified that he did not encourage SIGMA, but the calls continued. Crown itself was not a member of SIGMA. Archie Garrison, who was Pressler's predecessor as Manager of Administration, also admitted that he made telephone calls to competitors to discuss retail prices being charged by particular gas stations. Garrison called Hess Oil Company when Hess stations were hurting Crown sales by posting lower prices, asking Hess officials to "look into it." James C. Blackman, Crown's Mid-Atlantic Regional Office

reasons, we are persuaded that although the trial judge might have been wiser to hear

Blackman in person, he did not commit reversible error by refusing to do so.

Manager, acknowledged that he had called officers of Petroleum Marketing Corporation (PMC), another Crown competitor, asking them when PMC was planning to change its retail prices. Joseph J. Gilboy, Crown's Virginia District Manager, testified that he had received calls from PMC, asking him to raise Crown's retail gasoline prices and informing him in advance of PMC's price moves. When asked whether he returned calls to PMC, Gilboy equivocated. Telephone records confirm the placing of calls between Crown and each of the competitors mentioned here.

These calls were verified by the testimony of the officers of the competitors who participated in them. Irving Grossman, Price Coordinator for Hess, testified that he received calls from Crown and other oil companies informing him of prospective retail pricing actions, and understood these calls to be explanations of those actions. Henry R. Wainwright, Vice President of PMC, admitted that he made calls to the other oil companies to discuss future price moves and stated specifically that he talked to John W. Conway of Crown about pricing in the Maryland area.

Other evidence in the record lends support to the district court's findings. Tumminello's testimony (which was found credible by the trial judge) that officers of Crown had told him of an agreement with the other oil companies is corroborated by the testimony of Earl Burch, a Crown sales representative, who stated that he also received this information from his superiors at Crown. On several occasions, Blackman was able to predict the day and hour of competitors' price changes, since he sent field agents to watch other gas stations to see whether the price changed when he thought it would. Blackman's explanation for his prescience was that his knowledge was "based on competition in the area, what we had seen * * *." Finally, there was the testimony of Howard Knox. We have reserved discussion of Knox's testimony to the end of this review of the evidence, because it is vigorously assailed by Crown.

Howard Knox was Administrative Aide and secretary to two vice presidents of PMC, Wainwright and Ferguson. Knox testified that the vice presidents for whom he worked called all the independent dealers, including Crown, just before a planned price hike to find out whether the other dealers were going to "go along" with it. He was in a position to hear the officers actually speaking with the other conspirators. These telephone calls took place during 1970 and 1971, while Knox was working for PMC. Knox himself took some messages from other independents to relay to his superiors, and he testified that he took such a message from Crown. Knox stated that he called Crown himself "six or seven times" to advise Crown of proposed changes in gasoline prices. The district court, in finding the existence of a horizontal conspiracy, accorded "particular weight" to Knox's testimony.

Crown attacks Knox's testimony on several grounds. First, no particular dates for any of the phone calls Knox described were given, nor could Knox recall the details (as opposed to general tenor) of the price-fixing communications. Crown also suggests that Knox had a "bone to pick" with one of his superiors at PMC, implying that he had a strong motive to fabricate damaging testimony. Both of these objections, however, relate to the credibility of the witness, and the district court resolved them adversely to Crown. In the light of the whole record, we decline to upset the trial judge's resolution of these issues.

Crown's frontal attack on Knox is based on his subsequent testimony in other proceedings, particularly a deposition taken in a subsequent civil action against PMC. Counsel for Crown attended the deposition and participated in the cross-examination, apparently for the purpose of discrediting Knox and obtaining ammunition to use in the present proceeding. Four salient points emerge from this deposition:

1. In his testimony before the trial judge in the present case, Knox said that he had no ill feelings at all toward any representative of PMC. In his deposition,

he admitted that he had ill feelings toward Mr. Ralls of PMC. To that extent, his testimony before the district court in the present case was false.

2. Knox was confronted at the deposition with telephone records and company price-changing records for the periods of time he was employed by PMC and was unable to correlate particular price changes with particular telephone calls to competitors. The strong implication, according to Crown's counsel, was that such a correlation was impossible, but without the records before us we cannot resolve the question.

3. Knox testified before the district court in the present case that he telephoned Crown to suggest price changes and that Crown representatives would later call him back to give their assent. In his deposition he admitted that, many times, the assent would be given in the same conversation. To that extent, his testimony before the district court in this case conflicted with the deposition.

4. Knox stoutly reaffirmed in his deposition that the calls he described actually took place largely as he had explained them in this case.

█ The district court ruled that the deposition evidence was not properly a part of the record before him and refused to consider it. The court also found that even if the deposition were admitted "it would not affect the weight which this Court has accorded the trial testimony of the witness Knox." We are disposed to agree with the district court's ruling [cf. *Curtis Publishing Co. v. Butts,* 351 F.2d 702, 717 (5th Cir. 1965), *aff'd* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)], since the evidence merely affected the weight to be accorded Knox's testimony and would not have changed the result in this case. The trial judge found that the admission of the deposition in evidence would not change any finding of fact. The trial judge has made this credibility determination and we have been shown no convincing reason to disturb it.

A formidable array of evidence thus supports the district court's finding that Crown participated in an elaborate conspiracy among independent oil dealers to fix the retail price of gasoline in the Baltimore area in the early 1970's. It is settled law that

Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.* \* \* \* *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940).

Therefore, the district court's finding of liability on the charge of horizontal price fixing must be affirmed unless Crown can demonstrate that the finding is clearly erroneous or that Crown has a legal defense. It has done neither.

█ Crown argues that each of the pieces of evidence supporting the horizontal conspiracy finding is so small and unconvincing that the evidence as a whole does not amount to proof that a conspiracy existed. We are not constrained, however, to be so microscopic in our examination of the record. As the Supreme Court wrote in *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962):

\* \* \* In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. " . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. [citation omitted.] and in a case like the one before us, the duty of the jury [and, therefore, of the trial judge in the case at bar] was to look at the whole picture and not merely at the individual figures in it." *American Tobacco Co. v. United States,* 147 F.2d 93, 106 (6th Cir. 1944).

Taken as a whole, the evidence presented at trial and reviewed above affords adequate support for the conclusion that Crown participated in a horizontal price-fixing conspiracy. Crown has pointed to a few minor points in the findings of fact (such as that Crown employees were proud of the price stability in the Maryland market) which may be slightly inaccurate. But minor flaws in the record are to be expected in a case of this size and complexity, and we hold that these errors (if errors they were) are harmless. The major findings of fact are fully supported by the record.

■ Crown next maintains that the district court failed to consider the objective evidence Crown introduced to explain and justify its pricing policies and changes. Evidence of the pricing patterns of the major oil companies, plus evidence from legitimate sources of the availability of information regarding gasoline prices charged by independent companies, says Crown, disprove the existence of a conspiracy, because the pricing policies could have arisen legitimately. This argument sidesteps the district court's finding that *these* pricing policies did *not* arise legitimately; the trial judge was as free to disregard this evidence as he would have been to disregard the contrary evidence (supporting the conspiracy finding) which Crown now asks us to ignore. The district court did not err in failing to accord conclusive weight to Crown's evidence of independent pricing justification.

■ Finally, Crown argues briefly that the telephone calls admittedly made by its officers about gasoline prices were legitimate inquiries to avoid potential Robinson-Patman Act violations. Passing over the obvious rejoinder that price discrimination claims under the Robinson-Patman Act arise only when prices decrease (and these calls were often associated with price increases), it is enough to point out that only one witness at trial (Wilbur Pressler) mentioned the Act as a possible justification for the pricing calls, and he failed to keep records of the calls which would be the natural object of anyone genuinely concerned over Robinson-Patman violations. The district court was justified in rejecting this tenuous contention.

III. The Vertical Price-fixing Findings

■ In addition to the horizontal agreement among the independent oil companies to stabilize retail prices, the district court also found the existence of a vertical conspiracy by means of which Crown controlled its dealers' retail prices. Crown asserts that this finding is based on a misinterpretation of the evidence presented at trial, and that no vertical conspiracy existed.

We note first that the district court found a "pervasive web of illegality," and that the division of a price-fixing scheme such as that found here into "horizontal" and "vertical" components is, in some measure, an abstraction.[2] The horizontal agreement would have been worthless if Crown had not the power to control the retail prices charged by its dealers. The point of the horizontal conspiracy was to stabilize the *retail* price market, and an agreement with competitors to hold retail prices steady would not work without control over those prices. The existence and duration of the horizontal conspiracy, then, is itself some measure of proof that Crown was able to control the retail prices its dealers charged. Crown recognizes this when it argues that the vertical price-fixing case must fall if the horizontal case is not proved. Since we have upheld the finding of horizontal price fixing, the reverse is true: the vertical price-fixing conspiracy finding is buttressed by the finding of the horizontal conspiracy.

Turning to the substantive evidence, we find in the record ample support for the district court's finding of vertical price fixing. The most convincing piece of hard evidence is a memorandum dated October 9, 1968, which Crown Vice President John I. Loving wrote to Crown Regional Manager

---

2. The difficulties generated by this abstraction are illustrated by the parties' semantic wrangling—and the trial judge's partial confusion— over which damages are attributable to which part of the conspiracy, a problem discussed more fully below.

T. H. Cahir (with copies to Garrison and Pressler). The memorandum outlined the agreement to be reached with a new independent dealer. The first paragraph of the outline read:

> Gross gasoline margins of 4.75¢ and 5.25¢ house brand and premium, respectively. Margins on both grades to escalate up or down ¼¢ per gallon with each 1¢ on the pump (base posting = 29.9¢ and 33.9¢). This does not apply to postings increased due to a tax increase. Minimum margin will be 3.75¢ and 4.25¢. Above understanding to be verbal. Pump postings at Crown's discretion.

This single piece of evidence demonstrates that Crown was to control both the retail price being set and the dealer's profit margin, which was to be keyed directly to the preset retail price. Its insistence on a verbal agreement also suggests some consciousness of wrongdoing on the part of Crown's officers.

Crown attempts to circumvent the devastating implications of this memorandum by maintaining that the document was an internal communication which described Crown's method of calculating its wholesale price from a previously determined "suggested" retail price. This argument must fail, since the document by its own terms is a description of the agreement to be reached with the dealer, not a guide to wholesale price calculation. Furthermore, the phrase "pump postings at Crown's discretion" is hardly consonant with the notion of a "suggested" price; it sounds more like a fiat than a suggestion.

A second highly probative piece of evidence is a clause in Crown's standard dealer lease which provided that any dealer's lease could be cancelled on 5-days' notice for any reason, or for no reason at all. Short-term leases have been found to be inherently coercive devices, and when used to promote price-fixing schemes they become patently illegal. The Supreme Court wrote in *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 368, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443 (1965), that

\* \* \* Among the sources of leverage in [the oil company's] hands are its lease and equipment loan contracts with their cancellation and short-term provisions. Only last Term we described the power implications of such arrangements in *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), and we need not repeat that discussion here. \* \*

The inherently coercive leases found unacceptable in *Simpson* were simply 1-year renewable leases with no 5-day cancellation clause like that found here.

█ Of course, the mere existence of the clause does not prove an antitrust violation. It must be shown that the clause was used to further an illegal scheme. An abundant showing was made in this case. Plaintiffs Phillips and Freitag were threatened with abrupt cancellations if they failed to comply with Crown's "suggested" retail prices. So were Margaret Kling, David Horner, and William O'Hara, three Crown dealers who are not parties to this suit.

Furthermore, all four plaintiffs, and other nonparty witnesses, testified to considerable pressure by Crown to insure compliance with Crown's retail pricing policies. On one occasion, a Crown representative actually changed the prices on Tumminello's pumps during his absence from his station. Other testimony could be cited, but what we have discussed establishes that the trial judge permissibly found the existence of an extensive (and largely successful) vertical price-fixing conspiracy. Consequently, the district court's finding of liability on the vertical price-fixing conspiracy count is affirmed.

IV. The Motor Oil Tying Agreement

Crown prohibited its dealers from selling any brands of motor oil other than Crown's own. The district court held that this prohibition was an illegal tying agreement in violation of section 1 of the Sherman Act (15 U.S.C. § 1). Because we feel that the district court misinterpreted the emerging law of tie-ins in franchise settings, we reverse on this issue.

A *per se* tying violation is shown when three elements exist: The fact of a tying agreement, the affecting of a "not insubstantial" amount of interstate commerce, and sufficient economic power in the market for the tying product for the seller to restrain competition in the market for the tied product. *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The first of these elements is uncontested; the district court's finding that the second existed is supported by substantial evidence and should not be disturbed. The difficulty centers on the third element—the seller's economic power in the market for the tying product.

The district court nowhere identified what it considered to be the tying product in this case. It is possible that either Crown gasoline or Crown service station leases were deemed to be the tying product. Without inquiring at length into the market for either, the court simply observed that Crown's power to impose the tie-in was amply demonstrated by the fact that it had done so. The court was probably guided by remarks in past tying cases that the oil company's plenary economic power over its dealers is inherent in the structure and economics of the petroleum distribution system. *Federal Trade Commission v. Texaco, Inc.*, 393 U.S. 223, 226, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968).

But that comment, and others like it, were made in cases where the tied product was not purchased directly from the seller of the tying product. Slightly different considerations apply when the tying agreement is part of an otherwise valid franchise arrangement, since the very essence of a franchise is the purchase of several related products in a single competitively attractive package. A thorough discussion of the law of tying agreements in franchise settings is found in *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1224 (3d Cir. 1976). The Third Circuit, faced with the problem of deciding whether class action plaintiffs had to show that they were each individually coerced by the exercise of dominant market power, analyzed the problem in this way:

\* \* \* Under the district court's theory a class of franchisees could prove a per se illegal tying arrangement by establishing: (1) that the franchisor was economically dominant over its franchisees; (2) that the franchisor offered for sale, and sold, more than one product to its franchisees; and (3) that the franchisor had a policy to persuade franchisees to buy its products.

It is difficult to conceive of a franchisor-franchisee relationship in which this could not be established. The very nature of the franchise institution contemplates the presence of a comparatively strong financial entity—the franchisor—that makes available to a relatively weaker financial entity—the franchisee—an attractive business opportunity at a relatively modest initial investment. \* \* \*

This analysis makes clear that it is the seller's power in the *lease* market that must be examined (since no dealer could obtain or keep a Crown lease without agreeing to the tie-in) to see if the necessary economic power existed. Such an inquiry was outlined in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), where the court observed:

\* \* \* Plaintiffs could show, for example that the defendants controlled a majority of existing service stations and that because zoning restrictions and high capital costs make development of new stations difficult, the defendants have sufficient market dominance over existing stations to impose a tie-in. [561 F.2d at 454.]

No showing of this kind was made in this case. The only relevant evidence in the record is that Crown's service stations captured about 4 percent of the gasoline market in the Baltimore area. And this figure is of doubtful relevance to power in the lease market. Lacking any other evidence on this point, it is clear that plaintiff's tying claim must fall for failure of proof. Accordingly, the motor oil tying agreement

did not violate section 1 of the Sherman Act; the plaintiffs are not entitled to damages, and the district court's holding on this issue is reversed.

As an alternate ground for our decision, we note that even if gasoline, not the lease, is viewed as the tying product, plaintiff's claim would still fail. In *Osborn v. Sinclair Refining Co.*, 286 F.2d 832 (4th Cir. 1960), we held that an oil company whose share of the market was more than 10 percent had sufficient economic power to support a finding of an illegal tying agreement where the tied product was not purchased from the lessor as part of the franchise agreement, rather from a third party which paid a commission to the lessor. The *Osborn* case probably represents a showing very close to the minimum permissible, and the case before us simply does not fall within the *Osborn* rule either quantitatively (4 percent as opposed to 10 percent) or qualitatively (tied product produced by a seller-landowner as opposed to third party producer). Cf. the Supreme Court's remarks about market share in *United States Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 614, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). Thus, while we hold that the tying product in this case is the service station lease, the result we reach would not differ if the tying product were gasoline.

### V.  The Refusals to Renew

■ Crown also attacks the district court's finding that Crown's refusal to renew the leases of the plaintiffs in due course constituted an unlawful refusal to deal, because the refusals were in furtherance of a price-fixing scheme which violated the antitrust laws. Crown argues that the testimony of its witnesses showed that there was a valid business purpose for each of the terminations, unrelated to any antitrust violations. Plaintiffs respond that the supposed "business reasons" were just fabrications, and that until they began to protest Crown's illegal pricing policies, there had been no reason to refuse the renewal of their leases.

The determination of motive, especially in a cloudy area, is a matter peculiarly within the province of the trier of fact. We conclude that the trial judge did not err in deciding as he did, for there was substantial evidence to support his conclusion. Plaintiffs' past good records in the operation of their stations, the extensive evidence that operators with more serious problems than the plaintiffs were *never* terminated, and the evasiveness on the stand of Edward T. Gillespie, Crown's main witness on this matter, are sufficient to uphold the finding of the district court.

* * * A refusal to deal based upon a contract provision [permitting termination or nonrenewal] is, in respect to the antitrust laws, no different from the right of traders generally to select their customers. In either case, the right is limited to situations where the seller has not put together an arrangement in restraint of trade. * * * *Osborn v. Sinclair Refining Company*, 324 F.2d 566, 575n (4th Cir. 1963).

### VI.  The Permanent Injunction

On December 15, 1975, the district court issued a mandatory injunction which granted to each of the four plaintiffs a 3-year lease on the premises occupied by him, beginning with the date of the court's order. The defendant was also enjoined from refusing to renew the leases at the end of the 3-year term for any retaliatory reason related to the plaintiffs' success in the litigation or for any other reason prohibited by the antitrust laws. In this appeal, defendant argues that the injunction should be dissolved by this court on the ground that the plaintiffs have not demonstrated, and the district court has not found, that legal remedies were inadequate to compensate the plaintiffs for damages resulting from antitrust violations.

■ This court vacated the permanent injunction without prejudice when the case was first appealed, since we were unsure of the extent of Tumminello's perjury and we were hesitant to continue in effect an injunction which might be based largely on perjured testimony. We did not suggest at the time that there was an inadequate

basis for the injunction as it then existed; indeed, we noted that the district court had "a substantial basis, apart from Tumminello's testimony, to support his injunction * * *." *Phillips v. Crown Central Petroleum Corp., supra,* 556 F.2d at 705. We reaffirm that statement now. The district court has expressly found (opinion of October 24, 1975):

> * * * Crown's proclivity for persistently disregarding the antitrust laws * * belies any finding that a termination of the leases today, or in the near future, would be based on lawful reasons. [citations omitted.] This Court finds clear evidence indicating a danger of recurrent violations. * * *

The district court permissibly concluded that a permanent injunction was necessary to shield the plaintiffs from the effects of future antitrust violations by Crown. A future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such an injury is a legitimate end of injunctive relief. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. Gypsum Co.,* 340 U.S. 76, 89, 71 S.Ct. 160, 95 L.Ed. 89 (1950); *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir. 1969), *cert. denied* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

After this court's decision of April 6, 1977, defendant's counsel wrote to the trial judge as follows:

> As we construe the Fourth Circuit opinion, the Court of Appeals contemplated a hearing of the type requested in Crown's motion, *i.e.,* a hearing *limited to* the falsity of Tumminello's testimony beyond the admitted perjury, submission of new proposed findings and briefs and reevaluation of the evidence in the record * *. [Emphasis supplied.]

However, on the same day defendant filed with the district court a motion for hearing on the issuance of a preliminary injunction, contending that since the permanent injunction had been vacated, it was plaintiffs' burden to show the propriety of any new relief, and stating that in view of the developments that had occurred since the issuance of the injunction, plaintiffs could not meet that burden. Crown agreed that the district court had the power to enter a short-term restraining order pending discovery in preparation for an evidentiary hearing.

On April 26, 1977, after hearing oral argument of counsel, the trial judge issued an oral opinion denying the defendant's request for an evidentiary hearing and stating that a preliminary injunction would be entered without prejudice to defendant's right to dissolve the same as to one or more of the plaintiffs. It was the district court's interpretation of our decision that the status quo should be maintained until a decision was made on the principal question covered by this court's remand. An order was entered on the same day, vacating the permanent injunction as to plaintiffs Phillips, Freitag and Myers. By that time, Tumminello had been removed from his filling station because of his perjury and on the basis of the district court's decision that equitable relief should not be invoked prospectively for his benefit.

On May 12, 1977, defendant filed a motion to vacate the preliminary injunction as to plaintiffs Myers, Phillips and Freitag. Myers relinquished his station voluntarily on May 11, 1977, and the preliminary injunction was dissolved as to him by order dated June 27, 1977.

As previously stated, the district court on August 19, 1977, issued its decision and opinion in which it resolved the issues regarding the effect of Tumminello's perjury and ordered that plaintiffs Phillips and Freitag were entitled to a permanent injunction as provided in the order of December 15, 1975.

On August 29, 1977, Crown filed a motion to amend the order of August 19, 1977, and the district court responded by memorandum and order of October 13, 1977, setting forth its interpretation of our decision of April 6, 1977. The order stated that the district court had found that the perjury of Tumminello was in fact limited and that a

solid factual structure remained for the issuance of the permanent injunction. The order further provided that if events occurring since December 15, 1975, required a modification of the relief granted, Crown should file a motion to modify or dissolve the permanent injunction on the basis of facts which were not then of record. The court's order stated that it had invited Crown to do just that.

On November 15, 1977, Crown filed a motion to vacate or modify the permanent injunction which was ordered August 19, 1977, and at the time the parties filed their briefs herein, discovery was proceeding as a result of the filing of that motion.

■ Crown did not timely appeal from the order of April 26, 1977, which reentered the preliminary injunction, but now argues that the trial judge committed reversible error in renewing the injunction without a hearing to determine whether equitable relief was still warranted. Crown contends that it should have been afforded an opportunity to demonstrate that the conditions had changed so much that a permanent injunction was no longer required, and that the trial judge's order shifted the burden of proof from plaintiffs to defendant. When the term "vacated without prejudice" as used in our order is viewed in isolation, it cannot be said that Crown's contention is frivolous or wholly without merit. However, one must carefully consider all of the court's decision of April 6, 1977, to determine what this court intended when the injunction was vacated. The vacation "without prejudice" was a procedural device in the nature of a stay which was intended to permit the district court to determine the extent of Tumminello's perjury before the injunction became final. This is clear from the following portion of this court's previous opinion:

> * * * It is possible that the perjury was limited, and that *there remains* a solid structure for the injunction. * * Hence, we conclude that the District Court should have granted defendant's motion *to vacate or stay* the injunction and to conduct a hearing as prayed.

*Phillips v. Crown Central Petroleum Corp., supra,* 556 F.2d at 705. [Emphasis supplied.]

We did not intend, after it had resolved the primary issue on remand, to require the district court to disregard all of the evidence upon which it had relied in issuing the injunction, nor to obligate plaintiffs to file a new application for equitable relief as though no evidence in support thereof had ever been introduced in this protracted litigation. Admittedly, it would have been more appropriate and more consistent with this court's intention if the order of remand had "stayed" rather than "vacated" the injunction. However, on review of the whole record, we conclude that the district court properly interpreted and applied our decision and order of April 6, 1977, and that the district court did not err in the reentry of the preliminary injunction in order to maintain the status quo pending resolution of the controversy arising out of Tumminello's perjury. We hold also that after this issue was disposed of, the district court correctly decided that the record provided a solid basis for making the injunction permanent as to plaintiffs Phillips and Freitag.

If as defendant asserts, conditions prevailing since December 15, 1975, require a modification or dissolution of the injunction, that issue can be determined by the trial court on the basis of Crown's pending motion to vacate or modify the injunction ordered August 19, 1977.

### VIII.  Damages

Excluding the tie-in damages, damages were assessed in favor of the four plaintiffs aggregating $431,310 after being tripled. On the basis of testimony of plaintiffs' witness, Dr. Carl F. Christ, and exhibits prepared by him, the district court found substantial "horizontal damages" and "vertical damages." The terms appear to be related to the horizontal and vertical conspiracies alleged, but the theories underlying the assessment of damages are only loosely related to the facets of the conspiratorial scheme. The "horizontal damages" assessment was based upon a finding that Crown's wholesale prices to the plaintiffs

during the conspiracy period were higher than a competitive price, while the vertical damages award was premised upon the theory that Crown prevented its dealers from charging higher retail prices. We think the award of "horizontal damages" sustainable, but the award of "vertical damages" inconsistent and unsupportable.

### A.

■ Dr. Christ reasoned, and the district court found, that the conspiratorial limitation of competition among distributors enabled Crown to impose retail price requirements upon its dealers. It is true that during the period of the conspiracy there were no price wars between the retail outlets of the conspirators, except that one of Crown's retail outlets, Station P57 was in immediate competition with a Phillips station located at the same intersection. Phillips was not a member of the conspiracy, and, during the five-year period during which the conspiracy operated, the retail price of Crown gasoline at Station P57 was usually lower and never higher than Crown's imposed retail price upon the plaintiffs.[3] Crown gave the plaintiffs some incentive to maintain the imposed retail prices, for the wholesale prices charged to the plaintiffs moved in a predetermined relationship with their retail prices. Each increase in the retail price at the pump was divided between the dealer and Crown on a one to three basis. Thus, if there were an increase in the retail price of one cent a gallon, the dealer's gross profit margin was increased by one-fourth of one cent while Crown's wholesale price was increased by three-fourths of one cent. Since the higher the price the wider the dealer's margin, each dealer had a substantial incentive to comply with Crown's directions about retail prices, and there was no counter incentive since there was general agreement that maintenance of these prices did not cause a loss of retail sales.

Dr. Christ reasoned that the retail prices at Station P57 reflected the competitive price of gasoline in the Baltimore area. Since those prices at Station P57 were never above and usually were lower than the retail price imposed upon the plaintiffs, Dr. Christ computed the daily differentials. Applying the three to one ratio by which retail price increases and decreases were shared, he computed what the wholesale price to the plaintiffs would have been if their retail prices had been the same as those charged at Station P57. Applied to the actual gallonage sold by each dealer, he arrived at a sum by which the district court found that Crown's wholesale prices to these dealers had resulted in overcharges which could not have been exacted without the horizontal and vertical conspiracies.

Dr. Christ's "horizontal" damages represent compensation to the plaintiffs from the bottom end of their margin diminution. Here there is no error in calculation, since the wholesale price calculated by Dr. Christ for Station P57 (or any other station that happened to be charging the lowest price on a particular day) is presumably the price that Crown actually charged to that station. This price is a good yardstick for determining that wholesale price Crown should have been charging to all of its dealers, and the damages plaintiffs sustained for being charged an artificially high wholesale price were correctly calculated as simply the difference between the actual wholesale price charged to each plaintiff and the lower price charged to another station, multiplied by the total number of gallons purchased.

Crown's other arguments attacking the horizontal award all go to the specificity of the supporting evidence and the appropriateness of the standards used by the trial judge. Crown claims, for instance, that Station P57 was in an exceptional, competitive situation, that Crown accorded that station special treatment, and that it is wrong to suppose that Crown could have charged P57's "unrealistically low" wholesale price to all its dealers. We reject this contention, and others like it, because

---

**3.** Occasionally, Station P57 did not have the lowest Crown price in town. For convenience, however, we will consistently refer to the lowest charging station as P57.

\* \* \* a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. \* \* \* *Eastman Co. v. Southern Photo Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927).

If Station P57's wholesale price was unrealistic or aberrant, Crown has only itself to blame for not being able to point to another station whose price was more normal. The district court was entitled to use what it correctly perceived to be the best approximation of what the wholesale prices should have been.

■ One issue concerning the horizontal damages merits further attention. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Supreme Court held that a defendant-monopolist who increased the plaintiff's costs could not defend by asserting the plaintiff had passed on the extra costs to its buyers. The Court thus rejected, as a general rule, assertion of a "passing on" defense. This seems to us a classic pass-on case. Crown charged its retailers too much for gas; its retailers, in turn, charged consumers too much for the gas it bought at artificially high prices. There are two differences between this case and more common pass-on situations. First, through the vertical price fix, the pass-on was "insisted upon" by the wholesaler; it was not voluntarily and unilaterally effected by the retailer. Second, during the conspiracy period, the retail price and wholesale price moved in a fixed relation.

Crown relies on *Obron v. Union Camp Corp.*, 477 F.2d 542 (6th Cir. 1978), *affirming* 355 F.Supp. 902 (E.D.Mich.1972), which permitted assertion of the pass-on defense where the scheme of distribution was "com-parable to a 'cost-plus' contract." *Id.* at 543. There the dealer bought at 5% less than the wholesaler's list price and invariably resold at the list price. "Thus, whatever price [the wholesaler] imposed on the plaintiff, the plaintiff passed on to his customer plus 5%." *Id.* This case is different. It is true that the dealers' retail prices moved in a fixed proportion to the wholesale price. But, unlike *Obron*, no cost-plus arrangement insured that this immutable ratio would apply even in the absence of a conspiracy. Indeed, a free market surely would and did disrupt it. *See* Pl. Ex. 69, Table D (indicating that wholesale and retail prices did not move in a fixed relation in the post-conspiracy period). Thus we cannot say with certainty that the wholesale overcharges did not injure the Crown dealers. We know that absent a conspiracy Crown's wholesale prices would have been lower. We do not know what the dealers would have charged at retail. If, in fact, a conspiracy-imposed increase in retail prices did not significantly reduce sales, it would not have been surprising if the dealers had "found" those advantageous prices in a free market. Thus Crown's pass-on argument runs afoul of the specific teaching of *Hanover Shoe* : "Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. . . . [E]stablishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 493, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968).[4]

---

4. There is another reason for not applying the cost-plus contract exception. In *Hanover Shoe*, the court recognized that the pass-on defense might sometimes apply "—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract." 392 U.S. at 494, 88 S.Ct. at 2232. After *Hanover Shoe*, some courts opted for a broad reading of this directive, applying the cost-plus contract exception to similar arrangements. *See Obron, supra; State of West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (1971). In *Illinois Brick Co.*

### B.

Dr. Christ undertook to compute what he called "vertical damages" by examining the dealers' gross profit margins on a daily basis during the post-conspiracy period beginning April 3, 1973 and ending August 24, 1973. He compared these with the "theoretical" gross profit margins which, he says, would have prevailed if the conspiracy had remained in operation during that period of almost five months. He assumed that, if the conspiracy had continued until August 24, 1973, the wholesale prices charged would have been those actually charged during the period beginning April 3, 1973. He then computed a theoretical retail price on the basis of the relationship between wholesale and retail prices during the conspiracy period.[5] He found that the dealer's actual gross profit margins during the post-conspiracy period were slightly higher than what they would have been if his assumptions about prices were valid. This difference he converted to a post-conspiracy per-gallon gain which he then applied as a multiplier to all of the gallonage sold during the five-year conspiracy period.

The computation is seriously flawed. There is no basis for an assumption that wholesale prices during the post-conspiracy period were exactly what they would have been if the conspiracy had continued in effect. The district court found that the operation of the conspiracy resulted in higher wholesale prices than would have prevailed without the conspiracy. The court based a very substantial damage award upon the basis of the finding that the wholesale charges were excessive. There is no reason to suppose that, after removal of the leverage provided by the horizontal conspiracy, Crown maintained the economic power to maintain its wholesale prices at levels above competitive prices. Actual price figures establish that in the post-conspiracy period wholesale prices did not move with retail prices. The explanation which most readily suggests itself is that Crown no longer possessed the power to exact excessive charges to the extent that it had during the period of the conspiracy.

Moreover, while the testimony showed that during the conspiracy period wholesale and retail prices moved in a predetermined relationship, the control was the retail price, not the wholesale price. On the three-to-one basis, if retail prices moved up or down, the wholesale prices were adjusted. There is nothing in the record to suggest that independent movement of wholesale prices would have been similarly reflected in a movement of retail prices. Thus, Christ's attempt to hypothesize retail prices based on wholesale price movements is without foundation.

The most serious flaw in the use of the computation, however, was the demonstrable falsity in its assumption that the conspiracy had exerted a general depressing effect upon retail prices during the five-year period of the conspiracy. Clearly, this was Christ's assumption, for in five months' worth of post-conspiracy margin comparisons, there is not a single instance in which

---

v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), however, the Court seemingly read Hanover Shoe as extending the exception only to rare situations in which the middleman had a pre-existing cost-plus contract with his buyer, defining the amount to be purchased. "In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand." Id. at 736, 97 S.Ct. at 2070. In light of this restrictive rationale the cost-plus exception ought not to be applied here. See Mid-West Paper Prods. Co. v. Continental Group., Inc., 596 F.2d 573 (3d Cir., 1979).

Here, obviously the Crown dealers had no pre-existing supply contracts with motorists. Indeed, there was no "contract" at all. The "cost-plus" arrangement arose solely out of Crown's price-fixing policies. No dealer was "insulated from any decrease in its sales" when Crown raised retail prices.

5. Christ did not explain what he did in this way. He simply identified "theoretical margins" at the various actual wholesale prices. Of course, one can compute the hypothetical retail price by simply adding the actual wholesale price to the theoretical margin. In effect, this is all Christ did.

an hypothesized retail price exceeded the actual retail price.

The whole thrust of the plaintiffs' proof and the district court's findings was that Crown's price fixing kept retail prices up. Dr. Christ testified that the price fixing raised the retail price level, and the district court found that he had convincingly shown that without Crown's illegal restraints the retail price for gasoline would have been lower. Indeed, this was the basic premise upon which horizontal damages were awarded, since it was assumed that, without the conspiracy, retail prices charged by these plaintiffs would have been comparable to those charged by Station P57. The lowest price was posited to be a competitive retail price. Horizontal damages were awarded as a direct function of the extent to which the plaintiffs' prices exceeded the lower price. Notably, the plaintiffs' prices were never lower.

Crown is one of the minor distributors of gasoline. Its retail outlets, as those of other minor distributors, attract customers from the retail outlets of the major distributors by offering gasoline at somewhat lower prices. Before the conspiracy period, however, competition between the minors had resulted in price wars during which the differential between prices charged by the majors and the minors would widen to the point that the major distributors would put into effect retaliatory price cuts, thus lowering the ceiling to which the prices charged by dealers for the products of the minors could rise. The whole purpose of the conspiracy was to put an end to that kind of competitive effect. As long as the conspiracy was in operation, the endeavor of the conspirators was to maintain retail prices for their products at a level sufficiently below the retail price of the products of the major distributors to attract customers, but not so low as to affect the retail pricing of the products of the major distributors. Thus, the whole purpose of the conspiracy was to maintain retail prices above competitive levels.

The district court did find that on two occasions Crown vetoed retail price increases proposed by its dealers. If they suffered losses on that account, it is possible that they might be recoverable, but clearly the effects of these occurrences were transitory. Clearly, Christ has not attempted to measure any transitory effect of the restraints that Crown placed upon retail price increases, for he applied the multiplier to all of the gallons of gasoline sold throughout the entire period of the conspiracy, including gallons sold at inflated prices. Oddly, he did not seem to recognize that he was contradicting himself and the basis upon which horizontal damages were sought.

Clearly, comparisons of the dealers' actual gross profit margins during the post-conspiracy period with an entirely theoretical profit margin based upon competitive wholesale prices cannot be used to compensate any possible loss of sales during the conspiracy period. Dr. Christ himself testified that the actual gallonage sold was a reasonable approximation of what would have been sold in the absence of a conspiracy. If any such loss of sales because of the maintenance of higher retail prices had been suspected, it surely could not be measured by any data extrapolated from the post-conspiracy experience. Nor can damages be awarded on the basis of any such data with its essential inference that during the conspiracy period there had been a general depression, rather than a general inflation, of retail prices.

The wholly inconsistent awards of horizontal and vertical damages under these circumstances cannot stand.

### IX. Attorneys' Fees

There was an award of $200,000 as attorneys' fees for the plaintiffs. The amount of the damage award in the district court was a highly relevant consideration in fixing the amount of the attorneys' fees. Since we have determined that plaintiffs are not entitled to recover any part of the damages awarded to them by the district court as "Vertical Damages" and "Motor Oil Damages," this reduction in the damage award requires that there be an appropriate reduction in the amount allowed for attorneys' fees. Appropriate for consideration,

too, is the fact that plaintiffs, their lawyers, and their expert, Dr. Christ, complicated the computation of damages by confusing injections of inconsistent premises and assumptions. The district court is, therefore, directed to make redetermination of the amount that should be awarded as attorneys' fees on the basis of these additional considerations.

## X. Conclusion

The judgment is affirmed in part and reversed in part and the case remanded for further proceedings consistent with this opinion.

WIDENER, Circuit Judge, concurring and dissenting:

While I concur with the substantive holdings of the panel in this complicated case, I respectfully dissent on the issue of whether the district court properly conducted the remand hearing. I simply do not feel that the trial court complied with our remand order requiring "a full hearing" to determine the true extent of Tumminello's perjury, and an "examination thereafter of the findings, conclusions, and injunction." 556 F.2d 702, 705 (4th Cir. 1977).

On remand, the district court heard Tumminello testify as to the extent of his perjury, and held that the remainder of his testimony should be credited. In so doing, the district court credited Tumminello's testimony over the testimony of several Crown officials, including James C. Blackman, who had testified only by deposition at the trial. The defendant requested, among other things, that Blackman be allowed to testify in person at the remand hearing, but the district court denied this request. I believe the denial of this request was error. The court credited an admitted perjurer who admitted to the manufacture of false evidence in this very case over a Crown witness without ever viewing the demeanor of the latter. Of course, issues of credibility are often peculiarly within the province of the trier of fact and normally are within the scope of only limited appellate review. However, this rule has as its principal rational foundation the opportunity of the trier of fact to view the live testimony of both witnesses and then credit one over the other. It is the opportunity to hear the witness testify and observe his manner and demeanor on the stand which places the district court in a better position to judge credibility than that of an appellate court which must rely on a cold paper record.

In the case at bar, the district court credited live testimony over evidence taken by deposition, but the live testimony was from a witness whose admitted perjury with respect to certain parts of his testimony was the reason the case was remanded in the first place. I believe the district court was obliged to hear the live testimony of Blackman before making a credibility determination. It may be that after so doing the district court would yet have credited Tumminello, or it may be that even if Tumminello's testimony had not been credited the other evidence in the case might support a plaintiff's judgment. But the district court did not in terms base its holding on the sufficiency of evidence other than Tumminello's to support its finding, and, since it refused to hear Blackman, I would remand the case once again, this time for a new trial, and would give the defendant the opportunity to request trial by jury were it so advised.